[Cite as *State v. Beasley*, 2019-Ohio-1901.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28016 |
| | : | |
| v. | : | Trial Court Case No. 2016-CRB-321W |
| | : | |
| TIMOTHY BEASLEY | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 17th day of May, 2019.

. . . . . . . . . .

RONALD C. LEWIS, Atty. Reg. No. 0061980, 101 N. Detroit Street, Xenia, OH 45385
    Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, P.O. Box 574, Dayton, Ohio 45409
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1}   This matter is before the Court on Timothy Beasley's May 30, 2018 Notice of Appeal. Beasley appeals from his conviction in the Municipal Court of Montgomery County following a bench trial.   The municipal court found Beasley guilty of unlawful restraint, in violation of R.C. 2905.03(A), a misdemeanor of the third degree; domestic violence, in violation of R.C. 2919.25(A), a misdemeanor of the first degree; endangering children, in violation of R.C. 2919.22(A), a misdemeanor of the first degree; and obstructing official business, in violation of R.C. 2921.31, a misdemeanor of the second degree.   On the offenses of domestic violence and endangering children, the court imposed 180 days in jail, a fine of $100 (suspended), and court costs; the jail sentences were to be served concurrently. On the offenses of unlawful restraint and obstructing official business, the court imposed court costs only.

{¶ 2}   The offenses occurred on December 27, 2015.   Beasley was charged by way of four complaints on March 11, 2016. He entered pleas of not guilty to all charges and was tried on June 22, 2016.

{¶ 3} Officer Nicholas Millner of the Trotwood Police Department testified that, on December 27, 2015, he responded to an address on Natchez Avenue on a report of domestic violence; the "call log" in his cruiser indicated that the 911 call about the incident had been made by a small child.   He stated that, upon arrival, he knocked loudly on the front door of the home but got no response.   Millner testified that he "peeked in" the front door window and "could barely see a shadow of someone in the house walking around." Millner stated that, in "a nice tone," he advised the occupant of the house that "it's Trotwood Police," and "Please come to the door."   After failing to get a response, Millner called for backup. Millner stated that, while waiting for help to arrive, he walked around

the house knocking on windows, with no response.

{¶ 4} Millner testified that Officer Matthew Hogan and Sergeant Brandon Holbrook arrived and that Holbrook took charge of the scene. Millner stated that, when the officers eventually made entry into the home, Beasley "was walking down the hallway with a small child out in front of him" and, as Beasley did so, "an adult female came running past him." Millner testified that the officers repeatedly ordered Beasley to put the child down. Millner stated that he had his Taser pointed at Beasley, and that Beasley was ultimately arrested and taken to jail. Millner testified that, when he asked Beasley why he refused to answer the door, Beasley said, "because he thought he had warrants."

{¶ 5} On cross-examination, Millner testified that it was dark when he arrived at the home, there were no lights around the home, and he "could briefly see a shadow * * * of an adult possibly, maybe walking around" inside the home. Millner testified that the "door was kicked down" to gain entry into the home. Millner stated that the child Beasley held was "a little baby." He stated that Beasley moved slowly, and that he ultimately put the child in the child's bed. On redirect examination, Millner stated that he was outside the home constantly knocking and yelling for the occupants to come to the door for 10 to 15 minutes before officers gained entry to the home.

{¶ 6} Officer Matthew Hogan testified "dispatch informed us [they] heard screaming and yelling in the background" on the 911 call, and the caller reported that "mom and dad are arguing with each other." Hogan stated that he responded to the home with Sergeant Holbrook, and that he went to the rear of the home for security purposes in case someone tried to flee. Hogan stated that he identified myself in the back of the house and observed someone in the back room. "There was someone laying

on a bed. I could see a male in a lighter colored t-shirt walking around. Nothing in his hands but * * * his fists were balled up." Hogan could hear Sergeant Holbrook announcing himself at the front door, and Hogan stated that the occupants of the house "knew [the police] were there." Hogan testified that "at least 20 minutes" elapsed while Holbrook tried to make contact with the occupants, during which time Officers White and Buddo also arrived, and that "finally the decision was made to go inside." Hogan testified that, after Beasley was secured, he and Millner escorted Beasley to a cruiser. On cross-examination, Hogan stated that "there were lights on in the house coming from the hallway and I could see someone in the room as illuminated by the hallway" light.

{¶ 7} Officer Matthew Buddo testified that, when he responded to the Natchez Avenue address, the officers already present were knocking on the door and announcing themselves as "Trotwood Police." Holbrook advised Buddo that the officers "had to check on the welfare of everybody inside" and might "have to force entry." Buddo testified that the officers "rotated after a couple chances to get in the front door. And then it went to me and the door came open after about three kicks."

{¶ 8} Buddo stated that he and Millner entered the home first, and that his weapon was "at high ready." He stated that he observed Beasley "at the very end of the hallway holding a baby directly in front of him." Beasley was 20 to 25 feet away from Buddo and "standing at the doorway of the bedroom at the end of the hallway facing the front of the house." Buddo testified that he repeatedly ordered Beasley to put the child down; Beasley was "screaming," but Buddo could not make out what he was saying. Buddo stated that Beasley eventually walked toward him and said something about placing the child in the pack-n-play, which Beasley did. Buddo testified that Beasley was holding the

child "under the arms tightly against his body" and "directly in front of his person." Buddo testified that Beasley was detained after he put the child down. On cross- examination, Buddo testified that the period of time between when officers entered the home and when Beasley was detained "wasn't significant."

{¶ 9} Officer Eric White of the Trotwood Police Department testified that his cruiser was "either last or second to the last car at the scene." Upon arrival, he went to the front door and prepared to assist in the forced entry, which other officers had already decided to do. White testified that, once inside, he observed Beasley holding the baby "in front of his body as a shield"; Beasley began "slowly walking toward the officers" while carrying the child in front of him, and asking questions like, "what's going on or what, you know, what's this about?" White testified that the officers instructed Beasley to put the baby down and come toward them, and that there was nothing preventing Beasley from putting the child down before he reached the officers.

{¶ 10} White testified that a woman, Andrea, and several additional children were present in the home; Andrea came from behind Beasley, "moving rather quickly" toward the officers, and Officer Hogan took "control of her" and set her on the couch. According to White, the photographs identified as State's Exhibit 3 depicted Andrea's neck at that time, and the following exchange occurred:

Q [BY PROSECUTOR]. And why did you photograph her neck?

A [BY WHITE]. It appeared that she had injuries to her neck. You got the red markings on the right side of her neck, which we figured was going to be consistent with a possible assault that may have taken place.

Q. * * * And are those injuries fresh injuries?

A. Yes, they appeared to be.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

BY [PROSECUTOR]:

Q. And did you have a conversation with her about that?

A. Yes, I did.

Q. And what did she tell you?

[DEFENSE COUNSEL]: Objection.

THE COURT: Grounds?

[DEFENSE COUNSEL]: Hearsay.

THE COURT: Response?

[PROSECUTOR]: She's reporting injuries of a crime at this point.

THE COURT: Okay, I'll allow it.

MR. WHITE: She said that - - that she and the Defendant had a - - had a verbal altercation where they ended up pushing each other and that she believed that she sustained the injuries while she was being pushed by the Defendant.

BY [PROSECUTOR]:

Q. * * * Now, you're interviewing her.

Did you do anything else with regard to Mr. Beasley at that point?

A. I interviewed her after Mr. Beasley was already in custody.

{¶ 11} On cross-examination, White testified that Andrea did not provide a written statement. White testified that, after the officers gave several commands to put the child

down, Beasley said he "was going to put him in the crib." According to White, it "took him longer than I thought [it] would." White testified that there was "a risk to the child in that he was holding it in front of him," and it would have been "preferable" that Beasley "put the child down right away."

{¶ 12} The following exchange occurred:

Q [DEFENSE COUNSEL]. * * * And [Andrea] thought she had a warrant?

A [WHITE]. There was a mention of one of the two thinking that the other had a warrant * * *

Q. And [in your] report itself you said that [Andrea] said she had a warrant - - thought she had a warrant?

A. She may have said that she thought she had a warrant. She did not.

Q. Okay.

A. But then she later said that Mr. Beasley wouldn't let her answer the door.

Q. Did Mr. Beasley have a warrant?

A. No, he didn't.

{¶ 13} Finally, Sergeant Brandon Holbrook testified for the State. He stated that he was called out on a "9-1-1 call initially placed by what dispatch described as a young male voice on the telephone," and that person reported that Timothy Beasley was "beating up his mother." Holbrook testified that Officer Millner had called him personally and asked him to respond to the scene. Holbrook stated that he and Hogan left the

police department at the same time to respond, and that Millner was the only one at the scene when they arrived. Holbrook stated that Millner indicated that he "had heard something inside or seen some motion inside that led him to believe that there were subjects inside that were not coming to the door."

{¶ 14} Holbrook testified that he performed "kind of a check around the house" to see if there were any windows that the officers could peer into, because "oftentimes someone will be held against their will to * * * prevent being found * * * in hopes that we're going to go away." Holbrook testified that he observed someone move the blinds in the southwest corner of the house, but that he could not ascertain if the person was a child or an adult, male or female.

{¶ 15} Holbrook testified that he returned to the front door and, in looking through the window he observed a male figure with a "stockier build" at the end of the hallway. Holbrook stated that the subject was "pacing" back and forth, and that his "hands were in a fist-type motion or manner * * * at least part of the time" that he was pacing. Holbrook testified that the officers' commands "were very, very, loud," and that they stated several times that they were not leaving until they made contact with someone in the house. Holbrook called for more backup and planned to enter the home. Holbrook testified that, upon entry, officers were in the living room of the home and each of them had "either a firearm or a less lethal option," such as a Taser, "drawn and at the ready[,] pointed down the hallway in the event that a potential suspect, armed suspect was to come down the hallway."

{¶ 16} Holbrook testified that he observed Beasley holding the baby and that the baby "was not being cradled." He stated that the baby was "facing outward towards the

officers." He testified over objection that the baby "would've been a barricade between the officers and that subject more like a shield type situation in case the officers tried to deploy a [T]aser * * * ." Holbrook stated that the fact that the child was being held "as a shield" and that the person was not obeying the officers commands affected their response to the situation. According to Holbrook, 30-45 seconds elapsed before Beasley began to move, and he was "in no hurry"; Beasley continued to hold the baby in front of him as he moved slowly down the hallway. Holbrook interpreted this behavior as Beasley's trying to avoid contact with the officers and to avoid being taken into custody.

{¶ 17} Holbrook testified that he did not know Beasley or his relationship to the baby, how many other people were in the home, or whether there were weapons to which Beasley might be able to gain access. "[A]t that point everybody in the house in my opinion is in some sort of danger because this person is clearly not listening to us. He's not doing what the officers are telling him to." Holbrook testified that there was no reason that Beasley could not have placed the child on the floor at any time. Beasley eventually placed the child in a crib or pack-n-play in the living room where the officers were assembled, and then he was detained.

{¶ 18} Holbrook further testified that, while Beasley was proceeding down the hallway, an adult female emerged "from the same bedroom" that Beasley had been in and out of while officers were looking in the house; she passed Beasley and "was listening to commands" and "doing what she was told to do." He learned that the adult female was the baby's mother, and he observed injuries on her neck. Holbrook stated that he also found three juvenile females and two juvenile males in the home.

{¶ 19} On cross-examination, the following exchange occurred:

Q [DEFENSE COUNSEL].    * * * You initially said when you went out there you thought that someone might have been held against their will, correct?

A [HOLBROOK].    Yes, sir.

Q.    That wasn't the case though was it?

A.    It could've been.

Q. * * * No one was held against their will were they?

A.    If you're asking me if the child that was being drug down the hallway * * * being held like this, * * * I would not say that was of the child's best interest.

I would say that the other kids based on * * * the actions of the * * * individual moving back and forth between the bedroom[s].    They were children.    I believe those children were instructed not to answer the door or not to move.

{¶ 20}   At the conclusion of the State's evidence, Beasley moved for an acquittal, and the court denied the motion.

{¶ 21} Beasley testified in his own defense.   He stated that, on December 27, 2015, he did not reside at the Natchez address but was "over there quite a lot" to visit his son with Andrea.   Beasley stated that his son was about six months old on December 27, 2015.   On that date, Beasley stated that he brought his daughters to Andrea's house, and that her children were there too.   He testified that "it was just a regular chill day.   We was just having family time enjoying our Christmas."   He stated that he, Andrea, and their baby were "laying in the bed * * * and the door got kicked in."   He stated that he did not

know why the police were there, and that he "instantly" grabbed his son, because the bed was "about four feet off the floor" and he did not want his son to fall off. Beasley testified that the police started telling me to "drop the baby. Drop the baby like it was a gun or something." Beasley stated that he told the officers that he was "about to put [the baby] in his bed," because he "wasn't about to just put [his] son on the floor when his bed is right there."

{¶ 22} On cross-examination, Beasley denied that Andrea had showed officers injuries on her neck and had alleged that he caused them. He stated that neither of them knew "why the police was even there." He stated that he did not hear the police until after they had started kicking the door, when they were "hollering and screaming outside." Beasley testified that he and Andrea had had a verbal argument earlier in the day.

{¶ 23} On November 2, 2016, the trial court found Beasley guilty of domestic violence, endangering children, obstructing official business, and unlawful restraint. The court ordered a presentence investigation.

{¶ 24} Sentencing occurred on May 1, 2018.[1] At that time, counsel for Beasley moved for a stay of execution. The following exchange occurred:

> [DEFENSE COUNSEL]: * * * My understanding is the complaining
> witness didn't appear for the trial. He has questioned about whether or not
> the evidence was sufficient for the conviction on the domestic violence and
> unlawful restraint.
>
> THE COURT: We're not here for that today.

---

[1] The unusual delay between the trial and sentencing was attributable to Beasley's failure to appear for sentencing, whereupon a warrant was issued for his arrest.

[DEFENSE COUNSEL]: Right. Well, but I'm saying these are - - these are the issues that bring me to the request for the stay of execution of sentence.

{¶ 25} Counsel also filed a written motion for a stay in the trial court. The court denied the stay, noting that "[t]his case has been around since 2015. He's been at large for some period of time, did not cooperate with the presentence investigation, and has a violent felony history." As stated above, the trial court sentenced Beasley to 180 days in jail, a fine of $100 (suspended), and court costs on the offenses of domestic violence and endangering children; the jail sentences were to be served concurrently. It imposed court costs only on the offenses of unlawful restraint and obstructing official business.

{¶ 26} Beasley raises two assignment of error on appeal. We note that the State did not file a responsive brief but rather "respectfully asked the Court to base its decision on the trial court's record and the brief" filed by Beasley. Beasley's first assignment of error is as follows:

THE TRIAL COURT VIOLATED BEASLEY'S CONSTITUTIONAL RIGHT TO CONFRONTATION BY ALLOWING OFFICERS TO GIVE HEARSAY TESTIMONY ABOUT WHAT THE ALLEGED VICTIM HAD TOLD THEM.

{¶ 27} In his first assignment of error, Beasley asserts that his convictions for domestic violence and unlawful restraint should be reversed because he did not have the opportunity to confront his accuser, Andrea; instead, her claims were presented through hearsay. He directs our attention to *State v. Byrd*, 160 Ohio App.3d 538, 2005-Ohio-1902, 828 N.E.2d 133 (2d Dist.). He argues as follows:

Here, Beasley (like Byrd) was convicted off the testimony of an officer who relayed what Andrea * * * had told him, to wit: the injuries were caused by an altercation with Beasley and Beasley did not let her answer the door when police arrived. These statements were made to Officer White at the house shortly after Beasley was arrested. Beasley did not have a chance to cross-examine Andrea regarding her statements. A reasonable person would anticipate that these statements would be used against him in an investigation and prosecution. As a result, Beasley's constitutional right to confrontation was denied and he was prejudiced by it.

{¶ 28} Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Hearsay is generally not admissible, except as provided by the U.S. or Ohio Constitutions, by statute or court rule. Evid.R. 802. We review a trial court's evidentiary rulings for an abuse of discretion, provided an objection is made at trial. *State v. Cunningham,* 2d Dist. Clark No. 11CA 0032, 2012-Ohio-2333, ¶ 22.

{¶ 29} We have previously noted:

The Sixth Amendment's Confrontation Clause provides, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." "The United States Supreme Court has held that the right to confrontation is violated when an out-of-court statement that is testimonial in nature is admitted into evidence without the defendant[']s having had the opportunity to cross-examine the declarant. *Crawford [v. Washington],* 541 U .S. 36, 68." *State v. Syx,* 190 Ohio App.3d

845, 2010-Ohio-5880, 944 N.E.2d 722, ¶ 23 (2d Dist.). The *Crawford* court stated that "the core class of testimonial statements includes statements 'that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' *Id.* at 52." *Syx* at ¶ 23.

"Despite the importance of this right, a violation of the Confrontation Clause can be harmless if 'it is clear beyond reasonable doubt that the admission of these hearsay statements did not prejudice' the defendant." *Matter of Umoh,* 2d Dist. Montgomery No. 16912, 1998 WL 737983 (Oct. 23, 1998). The factors to be considered in determining if error is harmless include " 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' (Citation omitted)." *Id.*

In *Crawford,* the defendant's wife, exercising her marital privilege, did not testify at his trial. *Id.,* 541 U.S. 36. Before trial, however, the defendant's wife described the stabbing her husband was charged with in a tape-recorded statement to police. *Id.* The recorded statement conflicted with the defendant's claim that the stabbing was self-defense. *Id.* The defendant argued that his wife's statement was not only inadmissible hearsay, but also violated his Sixth Amendment right of confrontation. *Id.* The district court

determined that the statement, though hearsay, was reliable and trustworthy, and allowed it into evidence. *Id.* The defendant was subsequently convicted. *Id.*

On appeal, the U.S. Supreme Court analyzed the reliability of the wife's testimonial hearsay statement under the Confrontation Clause. The *Crawford* court concluded that "where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69. Thus, the *Crawford* court found that because the wife's taped statement was testimonial, its admission during the defendant's trial violated his constitutional right to confrontation. *Id.*

*State v. Ali*, 2d Dist. Clark No. 2014 CA 59, 2015-Ohio-1472, ¶ 14-17.

{¶ 30} In *Byrd*, 160 Ohio App.3d 538, 2005-Ohio-1902, 828 N.E.2d 133, this Court held that the incriminating statements made by Donald Byrd's girlfriend to police during their investigation of the scene of an assault were testimonial in nature and should not have been admitted. *Id.* at ¶ 24. This Court concluded that Byrd was "entirely correct in asserting that a reasonable person would anticipate that the alleged statements made by [the girlfriend] would be used against him in an investigation and prosecution. In allowing [the officer] to testify as to those statements, Byrd was denied the right to face his accusers." *Id.*

{¶ 31} Regarding the domestic violence offense, Beasley's counsel objected to White's testimony regarding his "conversation" with Andrea about her injuries having been caused by Beasley. As in *Byrd*, we conclude that Andrea's statements to White were

testimonial in nature, and the trial court abused its discretion in overruling Beasley's objection thereto.  We conclude, however, that the admission of this testimony did not prejudice Beasley, given the additional, admissible evidence of domestic violence against him, as discussed below in our analysis of Beasley's second assignment of error.

{¶ 32} Regarding the unlawful restraint offense, Beasley directs our attention to White's cross-examination by counsel for Beasley as set forth above, in the course of which White volunteered, while no question was pending, that Andrea "later said that Mr. Beasley wouldn't let her answer the door."  The proper mechanism to challenge such unsolicited testimony is an objection thereto or a motion to strike, and not a Confrontation Clause argument on appeal.

{¶ 33} Furthermore, we presume that the trial court only considered appropriate evidence, since it is well-settled that in a bench trial, " 'a judge is presumed to consider only the relevant, material and competent evidence in arriving at a judgment, unless the contrary affirmatively appears from the record.' *State v. Eubank*, 60 Ohio St.2d 183, 187, 398 N.E.2d 567 (1979), citing *State v. White*, 15 Ohio St.2d 146, 151, 239 N.E.2d 65 (1968)."  *State v. Allen*, 2d Dist. Montgomery No. 27750, 2018-Ohio-3393, ¶ 20.  As with Beasley's domestic violence conviction, we will further analyze Beasley's unlawful restraint conviction in our analysis of his second assignment of error.

{¶ 34} In the absence of prejudice as to Beasley's domestic violence conviction, and presuming the trial court only considered material and competent evidence in finding Beasley guilty of unlawful restraint, Beasley's first assignment of error is overruled.

{¶ 35} Beasley's second assignment or error is as follows:

BEASLEY'S CONVICTIONS WERE AGAINST THE MANIFEST

WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 36} According to Beasley, "[r]eviewing the record as a whole, the evidence weighs heavily against a conviction, and the trial court lost its way in choosing to believe the State's witnesses." Beasley asserts that, beyond White's "hearsay evidence there was no evidence presented to support either the domestic violence or unlawful restraint verdicts" and that, even with the hearsay testimony, the unlawful restraint verdict was unsupported and against the manifest weight of the evidence, because there was no evidence that Beasley restrained Andrea's liberty.

{¶ 37} Regarding his obstructing official business conviction, Beasley asserts that he testified that he did not hear officers knock, and there was no testimony that officers saw Beasley inside, that Beasley saw officers and ignored them, or that the officers said anything other than "yelling their presence." Beasley asserts that there was no testimony that the officers announced "why they were there, what 'duty' they were trying to perform or what their purpose was." Beasley asserts that, upon the officers' entry, he was observed "within seconds in the hallway with his child," and that he made no furtive movements and cooperated with police; he did not resist arrest. "There was no testimony that Beasley purposefully prevented, obstructed, delayed, hampered or impeded the officers['] duties or entrance."

{¶ 38} Finally, regarding his conviction for endangering children, Beasley asserts that, "faced with 5 officers in his dark house with three small children present," he "likely went into protection mode." He points to the officers' testimony that he "did not try to avoid them and complied as he placed the child in a crib (albeit slowly)." According to

Beasley, "the alleged substantial risk to the health and safety of his son was officers with guns trying to arrest" him, rather than his own behavior. Beasley asserts that he "struggles to see how [his] having hold of his child upon officer[s'] abrupt entry (kicking the door down at night) was his creation of a substantial risk to his son."

**{¶ 39}** This Court has previously noted:

A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

In contrast, an argument based on the weight of the evidence "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶ 12; s*ee Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and

determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). * * *. The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

*State v. Johnson*, 2d Dist. Montgomery No. 26961, 2017-Ohio-5498, ¶ 14-16.

**{¶ 40}** R.C. 2919.25(A) proscribes domestic violence as follows: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." Pursuant to R.C. 2919.25(F)(1)(b), a "family or household member" includes: "[t]he natural parent of any child of whom the offender is the other natural parent." " 'Physical harm to persons' means any injury, illness or other psychological impairment, regardless of its gravity or duration."

**{¶ 41}** The record reflects that Beasley was specifically identified as Andrea's assailant. Holbrook testified that he responded to a "9-1-1 call initially placed by what dispatch described as a young male voice on the telephone that stated *that the person in*

*the residence by the name of Timothy Beasley was beating up his mother*." (Emphasis added.) As this Court has noted:

> Evid.R. 803(1) permits the admission of a "present sense impression," which is defined as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Similarly, Evid.R. 803(2) excludes an excited utterance from the hearsay rule. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

> The excited utterance and present sense impression exceptions to the definition of hearsay reflect "an assumption that statements or perceptions that describe events uttered during or within a short time from the occurrence of the event are more trustworthy than statements not uttered at or near the time of the event. Moreover, the key to the statement's trustworthiness is the spontaneity of the statement, either contemporaneous with the event or immediately thereafter. By making the statement at the time of the event or shortly thereafter, the minimal lapse of time between the event and statement reflects an insufficient period to reflect on the event perceived—a fact which obviously detracts from the statement's trustworthiness." (Internal citations omitted.) *State v. Crowley,* 2d Dist. Clark No.2009 CA 65, 2009-Ohio-6689, citing *State v. Travis,* 165 Ohio App.3d 626, 2006-Ohio-787, 847 N.E.2d 1237, ¶ 35 (2d Dist.).

In keeping with this rationale, 911 calls are usually admissible under the excited utterance or the present sense impression exception to the hearsay rule. *Ratliff v. Brannum*, 2d Dist. Greene No. 2008-CA-5, 2008-Ohio-6732, ¶ 132 (911 calls are admissible as excited utterances), citing *State v. Williams, 2d* Dist. Montgomery No. 20368, 2005-Ohio-213, at ¶ 17; *State v. Jackson*, 2d Dist. Champaign No. 2004-CA-24, 2005-Ohio-6143, ¶ 15 (911 tape was properly admissible as a present sense impression); *Crowley.* "The controlling factor is whether the declaration was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *Crowley,* citing *State v. Humphries*, 79 Ohio App.3d 589, 598, 607 N.E.2d 921 (12th Dist.1992). Whether a statement is made in response to a question from the dispatcher is relevant, but not determinative.

*State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 10-12.

**{¶ 42}** In the course of his testimony, Beasley testified that Andrea was his baby's mother; accordingly, she was Beasley's family member pursuant to R.C. 2919.25(F)(1)(b). Further, the trial court could have reasonably concluded that the child's 9-1-1 call, about which Holbrook testified without any objection, resulted from impulse and was spontaneous, and was therefore in the nature of an excited utterance or present sense impression. In other words, the circumstances of the call indicated its trustworthiness. Finally, White and Holbrook observed injuries to Andrea's neck, which White described as fresh and consistent with an assault. Construing this evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could have

concluded that Beasley knowingly caused or attempted to cause physical harm to Andrea. Having reviewed the entire record, we cannot conclude that the trial court created a manifest miscarriage of justice such that Beasley's domestic violence conviction must be reversed and a new trial ordered. We find that Beasley's domestic violence conviction was supported by sufficient evidence and not against the manifest weight of the evidence.

{¶ 43} R.C. 2905.03(A) proscribes unlawful restraint as follows: "No person, without privilege to do so, shall knowingly restrain another of the other person's liberty."

{¶ 44} Beasley was observed by officers pacing between rooms with balled fists, and Hogan opined that the occupants of the home were aware of the officers' presence, yet no one answered the door. Holbrook testified that, in his experience, "oftentimes someone will be held against their will to * * * prevent being found * * * in hopes that we're going to go away." Millner testified that when Beasley began walking down the hall with the baby, Andrea "came running past him," and White further testified that Andrea came from behind Beasley "moving rather quickly" toward the officers. Holbrook testified that Andrea emerged from the same bedroom as Beasley and that, as she passed him, she was listening to the officers' commands and "doing what she was told to do." We conclude that the officer's testimony about Andrea's compliant conduct in hurrying toward them only upon their entry into the home supported an inference that, until that time, Beasley has restrained her liberty to come to the door while the officers were outside. As we previously noted, Andrea's statement to Officer White about not being allowed to answer the door was offered without objection during cross-examination.

{¶ 45} Construing the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of unlawful

restraint proven beyond a reasonable doubt. Further, having reviewed the entire record, we cannot conclude that the trial court created a manifest miscarriage of justice such that a new trial must be ordered on the offense of unlawful restraint. In other words, Beasley's conviction for unlawful restraint was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 46} R.C. 2921.31(A) proscribes obstructing official business as follows: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties."

{¶ 47} As noted above, the officers herein responded to a report of domestic violence that was made by a small child. Millner testified that he knocked loudly on the front door and identified himself as a police officer. He stated that he observed the shadow of someone inside walking around, and after getting no response, he walked around the home knocking on windows. He stated that, in total, he was outside yelling for the occupants to come to the door for 10 or 15 minutes. Hogan stated that he could hear Holbrook announcing himself at the front door from behind the home. Holbrook testified that "our commands were very, very loud." Beasley told Millner that he did not answer the door because he "thought he had warrants," supporting Hogan's conclusion that Beasley was aware of the officers' presence and commands and ignored them.

{¶ 48} Beasley testified that he was at home "having family time enjoying our Christmas" when the police came through the door, and that he and Andrea did not "know why the police was even there." Beasley testified that he did not hear the police until he

heard "kicks on the door."

{¶ 49} The trial judge clearly credited the officers' testimony that loud, repeated attempts, all around the house, were made to make contact with Beasley, who refused to come to the door as ordered. We defer to the factfinders' assessment of credibility. Viewing the evidence in a light most favorable to the State, we conclude that any rational trier of fact could have found the essential elements of obstructing official business proven beyond a reasonable doubt. We further conclude that the trial court did not lose its way or create a manifest miscarriage of justice, and that Beasley's conviction for obstructing official business was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 50} Finally, R.C. 2919.22(A) proscribes endangering children as follows:

No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * *

{¶ 51} Officers Millner, Buddo, and White testified that Beasley was repeatedly ordered to put his son down and refused to do so until he reached the living room. Holbrook testified that there was no reason the child could not have been placed on the floor in the hallway. Beasley did not cradle his child but instead held the baby in front of him, facing the officers, while slowing walking in their direction while their weapons and Taser were at "high ready." White testified that Beasley held the child "in front of his body as a shield," and that "there's a risk to the child in that he was holding it in front of

him" in what was ostensibly a dangerous situation. Holbrook testified that the baby "would've been a barricade between the officers and that subject[,] more like a shield type situation in case the officers tried to deploy a [T]aser." Holbrook further testified that he was concerned that weapons might be present and accessible to Beasley and that Beasley might use the child "to get to a certain location to obtain another weapon."

{¶ 52} The trial judge clearly discredited Beasley's testimony that he acted to protect his child. Viewing the evidence in a light most favorable to the State, we conclude that a rational factfinder could have concluded that Beasley violated a duty of care which created a substantial risk to his child's safety by approaching armed officers who had weapons at the ready instead of complying with their repeated demands to put his baby down. We further conclude that the trial court did not create a manifest injustice in convicting Beasley of violating R.C. 2919.22(A). Beasley's conviction for endangering children was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 53} For the foregoing reasons, Beasley's second assignment of error is overruled.

{¶ 54} The judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, J., and TUCKER, J., concur.

Copies sent to:

Ronald C. Lewis
Lucas W. Wilder
Hon. James D. Piergies