[Cite as *State v. Sinkhorn*, 2020-Ohio-5359.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-79 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-564 |
| | : | |
| TIMOTHY SINKHORN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 20th day of November, 2020.

. . . . . . . . . . .

JOHN M. LINTZ, Atty. Reg. No. 0097715, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
    Attorney for Plaintiff-Appellee

APRIL F. CAMPBELL, Atty. Reg. No. 0089541, 46½ North Sandusky Street, Delaware, Ohio 43015
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Defendant-Appellant, Timothy Sinkhorn, appeals from his conviction of aggravated robbery and breaking and entering. According to Sinkhorn, the conviction for aggravated robbery was based on legally insufficient evidence and was against the manifest weight of the evidence. In addition, Sinkhorn contends that the Reagan Tokes Act is unconstitutional, and that because he was sentenced under an unconstitutional law, his sentence was clearly and convincingly contrary to law.

**{¶ 2}** We conclude that Sinkhorn's assignments of error are without merit. Sinkhorn's conviction for aggravated robbery was not based on insufficient evidence, nor was it against the manifest weight of the evidence. Instead, overwhelming evidence indicated that Sinkhorn threatened to stab a victim with a deadly weapon while immediately fleeing from an attempted robbery. Furthermore, the Reagan Tokes Act does not violate either the separation-of-powers doctrine or due process. As a result, the indefinite sentence the trial court imposed was not contrary to law, because it was imposed under a constitutional law. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

**{¶ 3}** The events that gave rise to this action occurred in the early morning hours of August 26, 2019. At the time, Stephanie Brown and her children lived on Grissom Avenue in New Carlisle, Ohio. For the previous five years, Brown had lived in the house, which her grandparents owned and which was where her mother had been raised. Trial Transcript ("Tr."), p. 86. As a child, Brown had often visited the house, and she had known Timothy Sinkhorn all of her life. *Id.* Sinkhorn lived in the same neighborhood

and had grown up with Brown's mother and Brown's aunts and uncles.   *Id.*

{¶ 4} New Carlisle is a small town and most people in Brown's neighborhood knew each other.   *Id.* at p. 87.   During the time that Brown lived in the house on Grissom, she saw Sinkhorn walking in the neighborhood, and he would stop and ask about her mother.   *Id.* at p. 86-87.

{¶ 5} Brown's boyfriend, Darrell Grafton, lived in St. Paris, Ohio, but stayed overnight at times with Brown, including on the night of the crime.   *Id.*   During the early morning hours of August 26, 2019, Brown was having trouble sleeping because her dogs kept barking.   *Id.* at p. 87-88.   When this occurred, Grafton would get up and look out the window, but she did not see anything.   After this happened several times, the dogs started barking again and "going crazy."   At that point, Brown looked out the side window of her living room and saw someone wearing a dark hoodie.   This person was pulling a pressure washer out of Brown's storage shed.   *Id.* at p. 87-88 and 97.   Brown then woke up Grafton, who grabbed a flashlight and ran outside.   Brown followed Grafton out.   *Id.* at p. 88.

{¶ 6} When they got outside, Grafton shined the flashlight on the man's face, and Brown recognized him immediately as Timothy Sinkhorn.   The flashlight was shining directly on Sinkhorn's face and Brown clearly saw him.   *Id.* at p. 88-89.

{¶ 7} At that point, Sinkhorn began yelling, "I have a gun.   I have a gun," and started waving something shiny at Brown and Grafton.   Tr. at p. 90 and 110.   Neither Brown nor Grafton was able to tell exactly what Sinkhorn had in his hand, but Brown believed he had a gun and was afraid Sinkhorn was going to shoot them.   *Id.* at p. 90 and 114.   At that point, Sinkhorn was running away, and Grafton ran after him.   Sinkhorn

was heading toward the stop sign at the intersection of Grissom Avenue and Slayton Street. This was significant, because Sinkhorn lived on Slayton Street. *Id.* at p. 93.

**{¶ 8}** Sinkhorn was carrying some objects, and when the pursuit reached the next-door neighbor's driveway, Grafton threw his flashlight at Sinkhorn. *Id.* at p. 110. At that point, Sinkhorn dropped whatever he had and ran to the street corner. After picking up his flashlight, Grafton caught up with Sinkhorn. *Id.* When they both got to the corner, Sinkhorn had a box knife in his hand.[1] It looked like Sinkhorn reached in his pocket and got the knife. *Id.* at p. 112. At that point, Sinkhorn said, "I've got a knife. I'll stab you." *Id.* at p. 110.

**{¶ 9}** According to Grafton, it was "Like, back up. Quit chasing me. Leave me alone." *Id.* Grafton responded that he did not care, and kept chasing Sinkhorn anyway. *Id.* at p. 110 and 112. Sinkhorn then went around the corner, ran down the road past a few houses, and ran up into a yard. *Id.* At that point, Grafton stopped chasing Sinkhorn because he did not want to go into other people's yards. *Id.*

**{¶ 10}** A call was placed to 911, and both Brown and Grafton spoke to the 911 operator. They then went into Brown's house and waited for the police to arrive. *Id.* at p. 90-91, 95, and 113. Deputy Shaw of the Clark County Sheriff's Office was the first officer to arrive. When Shaw asked Brown and Grafton if they knew which way the suspect had run, they pointed in the direction of Grissom and Slayton. Shaw drove around for three or four minutes, waited for additional deputies to get in the area, and then went back to Grissom to speak with Brown and Grafton. *Id.* at p. 135-137.

**{¶ 11}** After the victims provided Shaw with the name of a suspect (Sinkhorn), the

---

[1] The words "box knife" and "box cutter" were both used at trial to refer to this object.

police obtained an address for him. Deputies Lyman and Troutman then went to that address. Tr. at p. 137. Before entering the house, Troutman found a picture of Sinkhorn in the computer aided dispatch (CAD) system, and when he went inside, he saw a male who looked like Sinkhorn. However, the man was Sinkhorn's brother. Troutman ultimately found Sinkhorn in a back bedroom on the far side of the bed. Sinkhorn was in between the bed and the wall, and had thrown sheets and covers over his body in an attempt to not be seen. *Id.* at p. 128, 129, and 131.

{¶ 12} Deputy Shaw also went to Sinkhorn's house. When he went into the house, Sinkhorn was lying on a bed, handcuffed, and Troutman was searching Sinkhorn's pockets. Sinkhorn was nervous and sweaty; he had on blue jeans and no shirt. Troutman found a box cutter and a carrier case for the cutter in Sinkhorn's pockets. *Id.* at p. 139. The box cutter had a blade inside. *Id.* at p. 140. Shaw then transported Sinkhorn to jail, but stopped on the way at Brown's home to pick up the witness statements. *Id.* at 142. While Shaw was there, Grafton told him that additional evidence might be found close to the intersection of Grissom Avenue and Slayton Street. Shaw went down to the corner with Grafton and found a putty knife or chisel and what looked like a skillet or frying pan. *Id.* at p. 113-114 and 143-145. The chisel was located at about the place where Grafton had thrown his flashlight at Sinkhorn. *Id.* at p. 114.

{¶ 13} Sinkhorn was subsequently charged with aggravated robbery and breaking and entering. A jury trial was held on October 31, 2019, during which the State presented testimony from Brown, Grafton, Troutman, and Shaw. Sinkhorn did not present any witnesses. After the jury found Sinkhorn guilty of both offenses, the trial court held a sentencing hearing on November 6, 2019. At that time, the court sentenced

Sinkhorn to a one-year term for breaking and entering and to 10-15 years for aggravated robbery. The sentences were imposed consecutively, and pursuant to the Reagan Tokes Act, resulted in an indefinite prison term of 11 to 16 years. Sinkhorn timely appealed.

## I. Sufficiency and Manifest Weight

{¶ 14} Sinkhorn's First and Second Assignments of Error deal with the sufficiency and weight of the evidence. Because these matters are intertwined, we will consider them together. These assignments of error are as follows:

> The State's Evidence that Sinkhorn Committed Aggravated Robbery Was Legally Insufficient as a Matter of Law.

> Sinkhorn's Conviction for Aggravated Robbery Should Be Reversed, Because the Evidence Weighted Manifestly Against Convicting Sinkhorn of that Count.

{¶ 15} As a preliminary point, we note that Sinkhorn does not challenge his conviction for breaking and entering, but directs his arguments solely to the aggravated robbery conviction. Consequently, we will confine our discussion to that conviction.

{¶ 16} Concerning the sufficiency of the evidence, Sinkhorn contends that there was no evidence that he had a deadly weapon, as required for an aggravated robbery conviction. Specifically, although Sinkhorn stated that he had a gun, no gun was ever found. Furthermore, even though Sinkhorn had a box cutter and brandished it, this did not occur "immediately" after he attempted to commit a theft offense. Instead, according to Sinkhorn, distance and other events intervened. Finally, Sinkhorn argues that the box cutter did not meet the definition of a deadly weapon because Grafton testified that he did

not know if the box cutter was open.

{¶ 17} Regarding manifest weight, Sinkhorn uses the same arguments, but phrases them as issues of whether the inferences to be drawn from the evidence were believable or persuasive and supported the conclusion that he committed aggravated robbery.

{¶ 18} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."  *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).   In this situation, we apply the following test:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997).

{¶ 19} Moreover, "[a]lthough sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily

includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 58 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15. *Accord State v. Curtis*, 2d Dist. Montgomery No. 28512, 2020-Ohio-4152, ¶ 44.

{¶ 20} Sinkhorn was charged with having violated R.C. 2911.01(A)(1), which provides that:

No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it.

{¶ 21} A "deadly weapon" is defined in R.C. 2923.11(A) as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." Courts have held that a box cutter is a deadly weapon. *E.g., State v. Carter*, 8th Dist. Cuyahoga No. 84036, 2004-Ohio-6861, ¶ 14; *State v. Moore*, 6th Dist. Lucas No. L-15-1211, 2016-Ohio-3506, ¶ 19. Deputy Shaw also testified that in his training and experience, a box cutter is capable of causing harm to a person. Tr. at p. 141.

{¶ 22} In the case before us, there is no dispute about these facts: Sinkhorn stated that he had a knife, pulled a box cutter from his pocket, and threatened to stab Grafton.

Sinkhorn also had a box cutter on his person when he was arrested. Notably, R.C. 2911.01(A)(1) does not require that a weapon be actually used; all that is required is that the offender display or brandish a weapon, or indicate that it is possessed. That certainly occurred here, and whether there was testimony that the blade was open at the time was irrelevant.

{¶ 23} Furthermore, R.C. 2911.01(A)(1) does not require that a weapon be used during a robbery; the weapon may also be used, displayed, or brandished when an individual is immediately fleeing from a robbery. That obviously occurred here.

{¶ 24} In this context, we disagree with Sinkhorn's contention that his actions did not occur immediately after he committed the offense. Sinkhorn argues that there was a lapse of time because the box cutter was not brandished instantly. No lapse of time occurred here. To the contrary, Sinkhorn brandished the box cutter while he was directly fleeing from the crime scene.

{¶ 25} Sinkhorn also contends that an intervening incident (the throwing of the flashlight) occurred. However, the fact that one of the victims threw a flashlight was irrelevant. Everything that happened from the time Sinkhorn ran from the scene until Grafton gave up the chase occurred in a continuous sequence. We also note that overwhelming evidence established that Sinkhorn committed aggravated robbery. Accordingly, the First and Second Assignments of Error are without merit and are overruled.

### III. Reagan Tokes Act

{¶ 26} Sinkhorn's Third and Fourth Assignments of Error are also intertwined and

will be considered together.   These assignments of error state that:

> Sinkhorn's Sentence Under the Reagan Tokes Act Is Unconstitutional.

> Because the Statute Under Which Sinkhorn Was Sentenced Is Unconstitutional, His Sentence Is Clearly and Convincingly Contrary to Law.

{¶ 27} Under these assignments of error, Sinkhorn contends that Senate Bill 201 (also known as the Reagan Tokes Act) is unconstitutional.   The Reagan Tokes Act introduced indefinite sentencing for first and second-degree felonies committed after March 22, 2019.   *See* R.C. 2967.271.

{¶ 28} According to Sinkhorn, the Act improperly gives the Ohio Department of Rehabilitation and Correction ("ODRC") power to decide if a crime was committed and violates the separation-of-powers doctrine and Article III of the Ohio Constitution. Sinkhorn further argues that the Act violates due process by allowing the State to place "holds" on people without the right to a trial, an attorney, and a jury.

{¶ 29} The State's first response is that Sinkhorn waived these arguments because he failed to raise them in the trial court.   The State then contends that the issue is not yet ripe for review because the process under which the ODRC may use the "rebuttal process" outlined in the Act is about a decade away, i.e., when Sinkhorn's minimum sentences end.

{¶ 30} Under the Reagan Tokes Act, a trial court decides the minimum and maximum terms of a defendant's sentence.   When the minimum term expires, there is a presumption that the offender shall be released.   However, ODRC may rebut the presumption and hold a prisoner in custody up to the maximum term after holding a

hearing. *See* R.C. 2967.271(B)-(D). The statute contains factors that apply relating to an offender's conduct while in prison. *See* R.C. 2967.271(C). In addition, the statute also allows ODRC to recommend to the court that an offender's minimum sentence be reduced, based on the offender's "exceptional conduct while incarcerated or the offender's adjustment to incarceration." R.C. 2967.271(F)(1).

{¶ 31} As applied to the case before us, this would mean that Sinkhorn would be presumed entitled to release after serving 11 years of his sentence, but ODRC could rebut that presumption and decide to hold him in prison for up to 16 years (the full maximum term).

{¶ 32} The State has also responded to the separation-of-powers and due process arguments. However, we need not address these arguments because we recently upheld the constitutionality of the Reagan Tokes Act. *See State v. Ferguson*, 2d Dist. Montgomery No. 28644, 2020-Ohio-4153. In *Ferguson*, we concluded that the Act does not violate the separation-of-powers doctrine. We reasoned that the Act's scheme is consistent with established Ohio Supreme Court authority, which has held that "when the power to sanction is delegated to the executive branch, a separation-of-powers problem is avoided if the sanction is originally imposed by a court and included in its sentence." *Id.* at ¶ 23, citing *Hernandez v. Kelly*, 108 Ohio St.3d 395, 2006-Ohio-126, 844 N.E.2d 301, ¶ 18-20. (Other citation omitted.) As in *Ferguson*, the trial court here included the sanction in its sentence. *See* Judgment Entry of Conviction, p. 1-2.

{¶ 33} We further held in *Ferguson* that the Reagan Tokes Act does not violate due process. In this regard, we commented that:

"[T]he fundamental requisite of due process of law is the opportunity

to be heard in a meaningful time and in a meaningful manner." * * * The Reagan Tokes Law satisfies these requirements. The Law states that, in order to rebut the presumption of the minimum term, the DRC [Department of Rehabilitation and Correction] must make a particular statutory determination "at a hearing." R.C. 2967.271(C) and (D). The Law does not give the DRC unfettered discretion to require an offender to serve more than the minimum term. And it affords an offender notice and an opportunity to be heard before more than the minimum may be required.

*Ferguson* at ¶ 25.

{¶ 34} Other cases from our district have also upheld the constitutionality of the Reagan Tokes Act. *See State v. Barnes*, 2d Dist. Montgomery No. 28613, 2020-Ohio-4150, and *State v. Leet*, 2d Dist. Montgomery No. 28670, 2020-Ohio-4592.

{¶ 35} Based on the above discussion, the Third Assignment of Error is overruled. The Reagan Tokes Act does not violate either the separation-of-powers doctrine or due process. Furthermore, since the Reagan Tokes Act is constitutional, application of the Act to Sinkhorn's sentence did not make the sentence contrary to law. Accordingly, the Fourth Assignment of Error is overruled as well.


IV. Conclusion

{¶ 36} All of Sinkhorn's assignments of error having been overruled, the judgment of the trial court is affirmed.


. . . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.


Copies sent to:

John M. Lintz
April F. Campbell
Hon. Douglas M. Rastatter