[Cite as *State v. Debord*, 2023-Ohio-4204.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29709 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 00888 |
| | : | |
| CHRISTOPHER DEBORD | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

· · · · · · · · · · ·

O P I N I O N

Rendered on November 22, 2023

· · · · · · · · · · ·

PAMELA L. PINCHOT, Attorney for Appellant

MATHIAS H. HECK, JR., by RICKY L. MURRAY, Attorney for Appellee

· · · · · · · · · · · · ·

WELBAUM, P.J.

{¶ 1} Appellant, Christopher Debord, appeals from his convictions for aggravated murder, aggravated robbery, aggravated burglary, grand theft of a motor vehicle, tampering with evidence, and having weapons while under disability following a jury trial and a bench trial in the Montgomery County Court of Common Pleas. In support of his appeal, Debord claims that all of his convictions were against the manifest weight of the

evidence. Debord also claims that the trial court erred by allowing the State to impeach one of its own trial witnesses using a prior inconsistent statement and by allowing certain photographs of the deceased victim to be admitted into evidence. In addition, Debord claims that his trial counsel was ineffective for failing to object or properly object to those evidentiary errors. Debord further asserts that the trial court erred by failing to suppress statements he had made during a police interview and claims that the cumulative effect of that error and the aforementioned evidentiary errors warrants a reversal of his conviction. Lastly, Debord claims that the indefinite sentencing scheme applied by the trial court during his sentencing is unconstitutional. For the reasons outlined below, Debord's judgment of conviction will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On May 2, 2022, a Montgomery County grand jury returned a 17-count indictment charging Debord with four counts of aggravated murder, two counts of aggravated robbery, two counts of aggravated burglary, two counts of felony murder, two counts of felonious assault, one count of grand theft of a motor vehicle, three counts of tampering with evidence, and one count of having weapons while under disability. The counts for aggravated murder, aggravated robbery, aggravated burglary, felony murder, and felonious assault included three-year firearm specifications. The indicted counts were broken down as follows.

- **Aggravated Murder:** *4 counts - unclassified felony*
    1. R.C. 2903.01(B) (aggravated robbery/deadly weapon)

    2.    R.C. 2903.01(B) (aggravated robbery/serious physical harm)

    3.    R.C. 2903.01(B) (aggravated burglary/ physical harm)

    4.    R.C. 2903.01(B) (aggravated burglary/deadly weapon)

- **Aggravated Robbery:** *2 counts - first-degree felony*

    1.    R.C. 2911.01(A)(1) (deadly weapon)

    2.    R.C. 2911.01(A)(3) (serious physical harm)

- **Aggravated Burglary:** *2 counts - first-degree felony*

    1.    R.C. 2911.11(A)(1) (physical harm)

    2.    R.C. 2911.11(A)(2) (deadly weapon)

- **Felony Murder:** *2 counts - unclassified felony*

    1.    R.C. 2903.02(B) (felonious assault/serious physical harm)

    2.    R.C. 2903.02(B) (felonious assault/deadly weapon)

- **Felonious Assault:** *2 counts - second-degree felony*

    1.    R.C. 2903.11(A)(1) (serious physical harm)

    2.    R.C. 2903.11(A)(2) (deadly weapon)

- **Grand Theft:** *1 count - fourth-degree felony*

    1.    R.C. 2913.02(A)(1) (motor vehicle)

- **Tampering with Evidence:** *3 counts - third-degree felony*

    1.    R.C. 2921.12(A)(1) (alter/destroy cell phone)

    2.    R.C. 2921.12(A)(1) (alter/destroy shell casings)

    3.    R.C. 2921.12(A)(1) (alter/destroy Honda CRV)

- **<u>Having Weapons While Under Disability</u>:** *1 count - third-degree felony*

    1.    R.C. 2923.13(A)(3) (prior felony drug conviction)

**{¶ 3}** The charges stemmed from allegations that on February 13, 2022, Debord shot and killed his friend, Joshua Shortt, while inside Shortt's Germantown residence. It was also alleged that Debord stole items of property from Shortt, including Shortt's vehicle, and that Debord tampered with evidence, i.e., Shortt's cell phone, the shell casings from the shooting, and Shortt's vehicle.

**{¶ 4}** Following his indictment, Debord pled not guilty to all the charges and specifications and thereafter filed a motion to suppress. In the motion to suppress, Debord argued for the suppression of statements that he made during an interview with Sergeant Nathan Wale of the Germantown Police Department and Detective Gregory Stout of the Tactical Crime Suppression Unit.[1] Debord claimed that his statements to those officers should be suppressed because he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights during the interview. Debord also claimed that his statements were coerced by Sgt. Wale and Det. Stout's making false promises of leniency in exchange for his providing information about Shortt's murder.

**{¶ 5}** After holding a suppression hearing and reviewing Debord's video-recorded

---

[1] The Tactical Crime Suppression Unit ("TCSU") is an investigative unit that assists law enforcement agencies in eight cities within Montgomery County, Ohio. Germantown is one of the eight cities that the TCSU assists when additional investigating officers are needed.

police interview, the trial court overruled Debord's motion to suppress. Debord's case proceeded to a four-day jury trial. All the indicted counts and specifications were tried to the jury except for the count of having weapons while under disability, which was tried to the bench. The following is a summary of the testimony and evidence that was presented at Debord's jury trial.

*Shortt's Last Communication and the Discovery of Shortt's Body*

{¶ 6} On Sunday, February 13, 2022, Shortt's mother text-messaged 29-year-old Shortt to ask if he was going to watch the Bengals play in the Super Bowl that evening. Shortt sent his mother a text message back saying that he was going to invite his friend "Stretch" over to his house to watch the game. Shortt's mother then offered to purchase Shortt and his friend some chicken wings and nachos for delivery to Shortt's house. In response, Shortt told his mother that he would let her know in 30 minutes when to order the food. However, Shortt never contacted his mother.

{¶ 7} The next day, Shortt's mother sent Shortt a text message wishing him a happy Valentine's Day and asking if he was okay. Shortt's mother again received no response from Shortt. The lack of response worried Shortt's mother, so she decided to drive to Shortt's Germantown residence the next morning, February 15, 2022. When she arrived at Shortt's residence, Shortt's mother noticed that her son's red Honda CRV was not in the driveway. She thereafter used her set of keys to get into Shortt's house, which was locked and secure.

{¶ 8} Once inside the house, Shortt's mother fed Shortt's cat and looked around.

On the second floor of the house, Shortt's mother saw a silver box containing tattoo supplies and some clothes that she did not recognize as belonging to Shortt. As she was getting ready to leave the house, she glanced down into the basement and noticed a twin mattress turned upside down on the basement floor. She went down into the basement and saw a black quilt spread out on the floor with something underneath it. Thinking it was dirty clothes, Shortt's mother lifted a corner of the quilt and saw her son with dried blood on his face and his head in a pool of blood. She immediately called Shortt's father and then 9-1-1.

*Investigation at Shortt's Germantown Residence and Clark Gas Station*

{¶ 9} After Shortt's mother discovered her son's body, the police investigated and collected evidence at Shortt's residence. During that investigation, the officers discovered three bullet holes in the basement wall near Shortt's body and a nine-millimeter shell casing underneath Shortt's body. In Shortt's backyard, the police discovered an Amazon box with small holes that were consistent with the size of BB gun pellets. The police also discovered packaging material for a BB gun in a trash can outside of Shortt's residence and a manual to a BB gun in Shortt's bedroom closet.

{¶ 10} In addition to that evidence, the police discovered that some of Shortt's possessions, including his cell phone and red Honda CRV, were missing from the residence. In response, the Montgomery County Regional Dispatch Center issued a dispatch for all law enforcement agencies in the area to be on the lookout for Shortt's vehicle. Later that night, a Dayton police officer located Shortt's vehicle at a Clark gas

station.   The police officer saw two males, later identified as Debord and Dustin Cooper, exit Shortt's vehicle and enter the gas station.   The officer was able to apprehend Cooper in the gas station, but Debord left the scene in a black Chevrolet Equinox driven by Debord's friend, John Wilson.

*John Wilson*

{¶ 11} The police eventually tracked down and interviewed Wilson regarding his interactions with Debord, who Wilson knew as "Stretch."   During his video-recorded interview, Wilson told the police that, the day before the February 15th gas station incident, Debord had come over to his house and told him that he (Debord) had robbed and shot someone.   Video evidence from the Clark gas station and Wilson's trial testimony confirmed that on February 15th, Wilson followed the red Honda CRV containing Debord and Cooper to the Clark gas station while driving a black Chevrolet Equinox.   State's Ex. No. 180.   Wilson testified that he and Debord left the gas station in the Equinox after Cooper got arrested and then abandoned the Equinox around the corner.   Wilson testified that Debord's friend, Crista Sawvell, thereafter picked them up and took them to her residence.

*Crista Sawvell*

{¶ 12} Sawvell testified at trial and confirmed that she had picked up Debord and Wilson on the night of February 15, 2022, and taken them to her residence on Blackwood Avenue.   Sawvell testified that Debord, who she also knew as "Stretch," kept most of his

belongings at her residence. Sawvell estimated that Debord spent the night at her residence at least one or two days a week. Sawvell described her residence as a "safe place" for Debord and explained that it was a place where she "wasn't going to let anything happen to his stuff * * *[.]" Trial Tr. Vol. III, p. 270.

{¶ 13} Sawvell testified that on the night of the Super Bowl, February 13, 2022, Debord came to her residence at a late hour after she had been drinking. Sawvell claimed that she went to sleep after Debord arrived and did not have much interaction with him. Sawvell testified that when she woke up the next morning, Debord was gone, but that he returned later that afternoon with Dustin Cooper. Sawvell recalled that when Debord returned he was carrying several bags of clothes from the mall.

{¶ 14} The next day, February 15th, Sawvell observed that Debord and Cooper had parked a red vehicle behind her truck as she was getting ready to leave her residence for a job interview. Sawvell testified that, when she returned from the interview, the red vehicle was gone and there was a bunch of trash, battery cables, and a GPS navigation system left outside. Sawvell testified that Debord contacted her later that night and told her that he and Cooper had been pulled over by the police because the red vehicle they were driving was stolen. Sawvell testified that Debord asked her to come get him and their mutual friend, Wilson. Sawvell testified that she picked up Debord and Wilson at a nearby soap factory and took them back to her residence.

{¶ 15} Continuing, Sawvell testified that she had a motion-activated Arlo security camera installed on the front door of her residence. During trial, Sawvell identified video footage from her security camera taken on February 15, 2022, that showed Shortt's red

Honda CRV parked in her driveway and Debord, Cooper, and Wilson coming and going from her residence. State's Ex. No. 243(A). Sawvell testified that there had been more video footage of the red Honda CRV on her security camera, but that she had deleted it at Debord's request. Sawvell specifically testified that she had deleted video footage showing Debord cleaning out the red Honda CRV.

{¶ 16} Sawvell testified that in the weeks leading up to Super Bowl Sunday, she had seen Debord with a black and silver firearm that had a "weird button" on it. Trial Tr. Vol. III, p. 291. Sawvell specifically remembered Debord having the firearm in his possession at her friend Jessica's birthday party the weekend before the Super Bowl. Sawvell testified that during the birthday party, she, Jessica, and Debord had posed with the gun and taken pictures. Sawvell also testified that Debord had been frantic after Cooper was arrested and that his story about what happened did not make much sense. Sawvell recalled Debord telling her that he had heard shots and then ran and jumped in a car, but he had never mentioned who had been shot or whether anyone was killed.

*Search of Shortt's Red Honda CRV*

{¶ 17} Shortt's Honda CRV was impounded and searched by the police after it was located at the Clark gas station. The officer who searched the vehicle testified that, although the exterior of the vehicle was dirty and covered with road salt, all the windows and door handles of the vehicle had been wiped clean. The officer also testified that the spare wheel had been removed from the rear of the vehicle. Inside the vehicle, the officer discovered a cutting tool known as a Sawzall and an empty gas can.

*Investigation at Blackwood Avenue Residence*

{¶ 18} On February 16, 2022, the police received a tip that Shortt's Honda CRV had been spotted at Sawvell's Blackwood Avenue residence. In light of this information, the police went to the residence and conducted a trash pull. While going through the trash, officers found an empty bottle of Mr. Clean cleaner, an empty bottle of Clorox bleach, an empty bottle of Fabuloso bleach alternative, and a Honda CRV spare tire cover.

{¶ 19} Eventually, a search warrant was issued for the Blackwood Avenue residence. During a search of the exterior of the residence, officers found lug nuts, lighter fluid, two cans of Fix-a-Flat for patching tires, and various vehicle accessories and parts, including a spare wheel, a GPS navigation system, and an ice scraper. Officers also found a disaster pouch, which is commonly known as a body bag, and three nine-millimeter shell casings.

{¶ 20} In a firepit at the residence, officers discovered the charred remains of a Honda CRV manual and documentation from the Ohio Bureau of Motor Vehicles ("BMV"). The BMV documentation included Shortt's temporary driver's license and the certificate of registration for Shortt's Honda CRV. In addition, the firepit contained remnants of Shortt's Valley View High School Diploma, birth certificate, and insurance identification card.

{¶ 21} Inside the Blackwood residence, officers discovered shopping bags and several receipts, one of which had Debord's name on it. The officers also discovered a

backpack containing a green Crown Royal Bag with various illegal narcotics inside. At trial, Sawvell testified that the backpack belonged to Debord and that Debord had been carrying it the day he was arrested. The officers also found a second backpack containing a Social Security Administration envelope that was addressed to Debord.

*Investigation at Knights Inn*

{¶ 22} On February 17, 2022, the police received information that Debord had been staying in room 160 of the Knights Inn hotel on Poe Avenue in Dayton. After a search warrant was obtained for the hotel room, the police searched the room and discovered a BB gun in a dresser drawer. The BB gun matched the description of a BB gun that Shortt's father had told the police Shortt recently purchased from Amazon. It also matched the BB gun manual that was discovered in Shortt's bedroom closet.

*Cell Phone-Related Evidence*

{¶ 23} Kevin Horan, a former agent for the Federal Bureau of Investigation's Cellular Analysis Survey Team, assisted in Shortt's murder investigation by analyzing call detail records and cell phone tower signal data related to the cell phones of Shortt, Debord, and Cooper. Horan's analysis revealed that on February 13, 2022, Shortt's phone traveled to Middletown and began tracking around the location of Debord's phone at 5:28 p.m. From 5:48 p.m. to 6:07 p.m. both Shortt's and Debord's phones traveled from Middletown toward Shortt's Germantown residence. From 6:14 p.m. to 8:17 p.m. both phones were stationary in the area of Shortt's residence. From 8:18 p.m. to 8:20

p.m., both phones began traveling northbound toward Dayton. Between 8:33 p.m. and 8:39 p.m. both phones were in the downtown Dayton area. However, at 8:39 p.m. Shortt's phone remained stationary while Debord's cell phone traveled to the east side of Dayton. Then, at 9:37 p.m., Shortt's phone disappeared from the network, which Horan testified meant that the phone either powered off or was destroyed.

{¶ 24} Horan testified that the data indicating that Shortt's phone remained stationary at 8:39 p.m. while Debord's phone traveled to the east side of Dayton was consistent with Shortt's phone being ditched. Although Horan could not specifically say where Shortt's phone ended up, he testified that it was possible that the phone was thrown off a bridge, since Debord would have had to cross over "rivers and bridges and things of that nature * * * to get from the west side to the east side [of Dayton]." Trial Tr. Vol. IV, p. 592.

{¶ 25} Horan also testified that the Germantown Police Department provided him with certain MMS messages obtained from their search of Debord's cell phone. Horan explained that Debord had sent the messages to Cooper's phone at 8:28 p.m. and 8:38 p.m. on February 13, 2022, and that the messages were screenshot images of a GPS map showing that Debord's phone was located on Ohio State Route 4 ("Route 4"). Horan further testified that the logical route from Germantown to Dayton would be to go on Route 4, and that the cell phone data he analyzed fell in line with Debord's phone traveling along Route 4.

{¶ 26} While searching Debord's cell phone, the police also discovered images of a Remington R51 nine-millimeter firearm that were taken on February 14, 2022. State's

Ex. Nos. 237(A)-(C). At trial, Sawvell identified the firearm in the images as the same firearm that Debord had been carrying the weekend before the Super Bowl. Also, the images showed that the firearm was sitting on the lap of an individual wearing a pair of white, black, and gray camouflage pants—the same type of pants that Debord was wearing in the security video evidence taken from Blackwood Avenue on February 14th. In addition, the police discovered a screenshot image of an article headline reading: "Investigation underway after man found dead in Germantown," which had been captured on Debord's phone on February 15, 2022.

{¶ 27} While searching Cooper's cell phone, the police found incoming messages from a person labeled "Stretch" on February 14, 2022, that contained the same images of the Remington R51 nine-millimeter firearm that Debord had taken on his phone. State's Ex. No. 238(A). The contents of Cooper's cell phone also established that approximately one hour after receiving those images, Cooper had sent a text message to an unknown individual saying: "My dude got a Remington 9mm for sale if you'd be interested in it." Trial Tr. Vol. IV, p. 708; State's Ex. No. 238(B). In addition, at 8:45 p.m. on the night Shortt was shot, Debord sent the mother of his child a Facebook message saying: "Before [you go] to sleep tonight say a prayer for me ask him to keep me safe regardless of my sins[.]" State's Ex. No. 244; Trial Tr. Vol. IV, p. 507.

*Shell Casings and Bullets*

{¶ 28} Firearm examiner Patrick McLaughlin compared the single shell casing recovered from Shortt's basement with the three shell casings recovered at Blackwood

Avenue. McLaughin testified that all four shell casings were nine-millimeter casings and that they had all been fired from the same weapon. McLaughlin also compared three bullets that were recovered from the basement wall at Shortt's Germantown residence with five bullets/bullet fragments that were recovered from Shortt's body during his autopsy. McLaughlin testified that two of the bullet fragments from the autopsy were insufficient for comparison, but that the remaining six bullets were all nine-millimeter in caliber and had all been fired from the same weapon.

*Debord's Police Interview*

{¶ 29} On February 17, 2022, Debord contacted the Germantown Police Department and offered to come to the station and speak to the police. However, Debord did not attend the interview. Thereafter, Debord checked in with his probation officer and was taken into custody due to several probation violations. After Debord was taken into custody, Sgt. Wale and Det. Stout interviewed Debord on February 18, 2022.

{¶ 30} During his interview, Debord initially told the officers that he had not seen Shortt since before Christmas 2021, and that he had learned about Shortt's death through Cooper. Debord also told the officers that Cooper was the person who had brought Shortt's Honda CRV to him. However, over the course of the interview, Debord's story changed. Debord went from telling the officers that he had not seen Shortt since before Christmas 2021 to telling the officers that he had last seen Shortt on Valentines Day, February 14, 2022. Debord told the officers that once he and Cooper had learned that Shortt had been killed, they were worried about having possession of his vehicle.

Debord claimed that they had initially decided to drop off Shortt's vehicle somewhere after cleaning it out with bleach and detergents, but eventually decided it was a better idea to burn the vehicle. To carry out this plan, Debord told the officers that he and Cooper went to purchase gasoline at the Clark gas station in Dayton where the police ended up arresting Cooper.

{¶ 31} By the end of the interview, Debord's story had changed yet again. Debord eventually told the officers that he last saw Shortt on Sunday, February 13, 2022, when Shortt picked him up and took him to Shortt's house in Germantown to watch the Super Bowl. During that time, Debord claimed that he and Shortt had reached an agreement about Debord moving into one of Shortt's upstairs bedrooms. As a result, Debord claimed that he had left some of his clothes, a tattoo kit, and a beanie at Shortt's house.

{¶ 32} Debord also told the officers that, on the night of the Super Bowl, he heard Shortt get into a dispute with someone over the phone. Debord claimed that after the dispute, he saw Shortt put marijuana and methamphetamine in a drawer upstairs. Debord claimed that Shortt then went downstairs to meet someone while Debord stayed upstairs. Debord claimed that while he was upstairs, he heard four or five gunshots and a door close. Debord told the officers that, after hearing the gunshots, he went downstairs to see if everything was okay and eventually found Shortt lying in the basement in really bad shape. Specifically, Debord told the officers that Shortt was bleeding from his mouth and gargling blood and that he thought Shortt was dying. However, instead of calling for help, Debord told the officers that he went upstairs and grabbed some of Shortt's marijuana, took the keys to Shortt's vehicle, and then left

Shortt's residence in Shortt's vehicle, locking the door to the residence behind him. From there, Debord claimed that he drove on Route 4 toward Dayton. Debord claimed that he left the scene because he was worried about being blamed for Shortt's death and about the killer possibly returning.

{¶ 33} In addition to changing his story about his interactions with Shortt, Debord changed his story about the BB gun found at the Knights Inn hotel room. Debord initially told the officers that the BB gun belonged to his little brother, but eventually admitted to obtaining the BB gun from Shortt's Honda CRV.

*Debord's Confession to Jeff Salisbury*

{¶ 34} Jeff Sailsbury and Debord were cellmates in the same "pod" at the Montgomery County Jail after Debord was placed in custody on February 17, 2022. At trial, Salisbury testified that he had arrived at the jail before Debord, as Salisbury was taken into custody in late January/early February 2022. Salisbury testified that he had recognized Debord when Debord arrived because they had met each other approximately ten times outside of jail.

{¶ 35} Continuing, Salisbury testified that Debord had initially told him that he was being incarcerated for a probation violation, but later revealed that he was a murder suspect. Salisbury testified that, over a series of conversations, Debord had admitted to robbing and shooting Shortt, and Debord had provided various details about the shooting. For example, Debord told Salisbury that he had shot Shortt in the back while Shortt was kneeling down doing something in the basement. Debord also told Salisbury that Shortt

had turned around after being shot and looked at Debord really confused while saying Debord's nickname, "Stretch." Debord further told Sailsbury that he had been confused as to why Shortt was still alive and able to talk, and that he had pointed the gun at Shortt's chest and shot him again. Debord then told Salisbury that Shortt was still saying his nickname even after he had been shot in the chest, so Debord decided to shoot him once more in the face.

{¶ 36} In addition to that information, Debord told Salisbury that he had picked up the shell casings after the shooting and thrown them out every few miles as he was driving on Route 4. Debord also told Salisbury that he had thrown Shortt's cell phone into the river near Salem Avenue in Dayton.

*Shortt's Autopsy*

{¶ 37} Mary Goolsby of the Montgomery County Coroner's Office testified to performing an autopsy on Shortt's body. Goolsby testified that, to a reasonable degree of medical certainty, Shortt's cause of death was multiple gunshot wounds, and that the manner of his death was a homicide. Goolsby's testimony indicated that Shortt had been shot in the back, chest, and head. Goolsby indicated that the gunshots to the back and chest had been potentially survivable with medical intervention. However, Goolsby noted that the most damaging injury Shortt sustained was the gunshot to the head, which was near Shortt's right eye. Goolsby testified that this gunshot resulted in bullet fragments going into the left temporal lobe of Shortt's brain, which caused brain damage and a lot of bleeding. Goolsby also testified that the blood from that injury went down

into Shortt's airways and into his lungs and could have caused Shortt to gurgle or expel blood while trying to breathe.

*Jury Verdict and Bench Trial*

{¶ 38} After presenting the foregoing evidence, the State rested its case. The defense then moved for a Crim.R. 29 dismissal, which the trial court denied. Debord's case was thereafter submitted to the jury. After deliberation, the jury found Debord guilty of all the charges and specifications for which he was tried. Following the jury's verdict, the State presented two exhibits establishing that Debord had a prior felony drug conviction. Based on this evidence, the trial court found Debord guilty of having weapons while under disability as charged in the indictment.

*Sentencing*

{¶ 39} At sentencing, the trial court merged all of the aggravated murder, felony murder, and felonious assault counts and their attendant firearm specifications. Following the merger of those offenses, the State elected to have Debord sentenced for aggravated murder while committing aggravated robbery with a deadly weapon. For that offense, the trial court sentenced Debord to a term of life in prison without parole plus an additional three years in prison for the associated firearm specification.

{¶ 40} The trial court next merged the two counts of aggravated robbery. Following the merger of those offenses, the State elected to have Debord sentenced for the count of aggravated robbery alleging serious physical harm. For that offense, the

trial court imposed an indefinite term of 11 to 16.5 years in prison plus an additional three years in prison for the associated firearm specification. The trial court then ordered those sentences to be served consecutively to the sentences imposed for aggravated murder and its firearm specification.

{¶ 41} The trial court also merged the two counts of aggravated burglary. Following the merger of those offenses, the State elected to have Debord sentenced for the count of aggravated burglary alleging use of a deadly weapon. For that offense, the trial court imposed a definite term of 11 years in prison plus an additional three years in prison for the associated firearm specification. The trial court ordered the 11-year sentence to be served consecutively to the sentences imposed for aggravated robbery and aggravated murder, while ordering the associated firearm specification to be served concurrently to those sentences.

{¶ 42} Lastly, the trial court imposed 18 months in prison for grand theft of a motor vehicle, 36 months in prison for having weapons while under disability, and 36 months in prison for each of the three counts of tampering with evidence. The trial court ordered all of those sentences to be served consecutively to one another and consecutively to the sentences imposed for aggravated burglary, aggravated robbery, aggravated murder, and the associated firearm specifications. Accordingly, the trial court sentenced Debord to an aggregate term of life in prison without parole plus a consecutive term of 41.5 to 47 years in prison. In addition, the trial court ordered Debord to pay Shortt's mother $4,294.21 in restitution for Shortt's funeral expenses.

{¶ 43} Debord now appeals from his convictions, raising six assignments of error

for review.   For purposes of clarity, we will address Debord's assignments of error out of order.

## Fifth Assignment of Error

{¶ 44} Under his fifth assignment of error, Debord claims that all of his convictions were against the manifest weight of the evidence.   We disagree.

{¶ 45} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   (Citation omitted.)   *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12.   When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "   *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence."   *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61, 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.   A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances.   *Martin* at 175.

{¶ 46} As previously discussed, Debord was convicted of single counts of

aggravated murder, aggravated robbery, aggravated burglary, grand theft of a motor vehicle, having weapons while under disability, and three counts of tampering with evidence. Debord claims that these convictions were against the manifest weight of the evidence because there were no witnesses to Shortt's murder, no murder weapon was found, and no DNA evidence linked him to the offenses. We, however, disagree with Debord's argument and find that the manifest weight of the evidence overwhelmingly established that Debord killed Shortt by shooting him several times with a nine-millimeter firearm. The manifest weight of the evidence also overwhelmingly established that Debord stole property from Shortt, including but not limited to his vehicle, and then tampered with evidence, i.e. Shortt's cell phone, the shell casings at the scene of the shooting, and Shortt's vehicle and its contents.

{¶ 47} The testimony from Shortt's mother established that Shortt was last heard from on the evening of February 13, 2022, and that Shortt was with his friend Stretch, a.k.a. Debord, that evening. The evidence from Horan's cell phone data analysis also established that Debord and Shortt's cell phones were together in the area of Shortt's residence on February 13 between 6:14 p.m. and 8:17 p.m. Moreover, Debord himself admitted that he was at Shortt's residence on the evening of February 13 and that Shortt was shot that night. Accordingly, the weight of the evidence established that Debord had been with Shortt on the night of the shooting.

{¶ 48} The three bullets and the single shell casing recovered from the scene of the shooting and the bullets recovered from Shortt's body established that Shortt was shot with a nine-millimeter firearm. Images and messages taken from Debord and

Cooper's cell phones and Sawvell's trial testimony all established that Debord owned a nine-millimeter firearm that Debord had attempted to sell the day after Shortt was shot. The fact that Debord was trying to sell his firearm shortly after Shortt's death, and the fact the single shell casing found at the murder scene was expelled from the same firearm that expelled three shell casings found at the Blackwood Avenue residence where Debord often stayed suggested that Debord was the individual who shot Shortt.

{¶ 49} Moreover, while Debord was in jail, he admitted to his fellow inmate, Jeff Salisbury, that he had shot Shortt. Salisbury's trial testimony established that Debord provided Salisbury with specific details that only the shooter could have known, i.e., that Shortt was shot in the back, chest, and head. In addition, a body bag and remnants of Shortt's birth certificate, diploma, temporary driver's license, and other documentation, were discovered at the Blackwood Avenue residence where Debord stayed. We find that the weight of all this evidence established that Debord was the individual who shot and killed Shortt.

{¶ 50} The weight of the evidence also established that, after killing Shortt, Debord stole Shortt's Honda CRV, BB gun, cell phone, and drugs. As a result, we do not find that the jury lost its way or created a manifest miscarriage of justice when it found Debord guilty of aggravated murder while committing aggravated robbery with a deadly weapon, aggravated robbery while inflicting serious physical harm, and grand theft of a motor vehicle. Accordingly, those convictions were not against the manifest weight of the evidence. The attendant firearm specifications for aggravated murder and aggravated robbery were also not against the manifest weight of the evidence, as there was ample

evidence establishing that Debord used a nine-millimeter firearm during those offenses.

{¶ 51} Debord's conviction for aggravated burglary with a deadly weapon and its attendant firearm specification was also not against the manifest weight of the evidence. Generally speaking, aggravated burglary requires one to trespass into an occupied structure by force, stealth, or deception with the purpose to commit any criminal offense in the structure while another person is present. R.C. 2911.11(A). Here, the weight of the evidence established that Debord used a firearm to commit aggravated murder and aggravated robbery in Shortt's residence while Shortt was present. For purposes of the trespass element, we note that it does not matter that the evidence established that Debord was invited over to Shortt's residence, because "[w]e have recognized that 'one who enters a home with permission becomes a trespasser, subject to conviction for aggravated burglary, if he assaults the victim after gaining entry.' " *State v. Trigg*, 2d Dist. Montgomery No. 26757, 2016-Ohio-2752, ¶ 9, quoting *State v Perry*, 2d Dist. Montgomery No 26421, 2015-Ohio-2181, ¶ 29, citing *State v. Steffen*, 31 Ohio St.3d 111, 114-115, 509 N.E.2d 383 (1987). S*ee also State v. Metcalf*, 2d Dist. Montgomery No. 24338, 2012-Ohio-6045, ¶ 20 ("Pertinently, 'permission to enter a home is deemed terminated by the act of committing an offense of violence against a person authorized to revoke the permission.' "), quoting 2 Katz, Martin, Lipton & Crocker, *Criminal Law*, Section 104:6 (3d Ed.); *State v. Hart*, 2d Dist. Montgomery No. 19556, 2003-Ohio-5327, ¶ 43 ("[E}ven if Hart did not initially trespass, we conclude that a strong inference arises that once the shooting started, any permission Hart might have had to be in the residence was withdrawn, and that Hart knew that any privilege to remain on the premises was

revoked."). Therefore, the jury did not lose its way or create a manifest miscarriage of justice by finding Debord guilty of aggravated burglary with a firearm specification.

**{¶ 52}** Debord's three convictions for tampering with evidence were also not against the manifest weight of the evidence. With regard to the count pertaining to Shortt's cell phone, the evidence established that Debord admitted to Salisbury that he had thrown Debord's cell phone into the river near Salem Avenue. Horan's cell phone data analysis also supported Debord's admission to Salisbury. As previously discussed, Horan testified that Debord's and Shortt's cell phones had been traveling in the same direction until 8:39 p.m. on February 13, 2022, and that Debord's phone continued to travel to the east side of Dayton while Shortt's phone remained stationary and disappeared from the network an hour later. Horan testified that this information indicated that Shortt's phone was possibly ditched and noted that the phone could have been thrown off a bridge since Debord would have had to cross over "rivers and bridges and things of that nature * * * to get from the west side to the east side [of Dayton]." Trial Tr. Vol. IV, p. 592. Moreover, Shortt's phone was never recovered and there was no other evidence presented at trial explaining the disappearance of Shortt's phone. Therefore, the weight of the evidence established that Debord impaired the availability of Shortt's cell phone as evidence by throwing it into a river. Accordingly, we do not find that the jury lost its way or created a manifest miscarriage of justice by finding Debord guilty of the tampering with evidence count that pertained to Shortt's cell phone.

**{¶ 53}** As for the count that pertained to the shell casings, Debord confessed to Salisbury that he had picked up the shell casings at the scene of the shooting and then

thrown them away every few miles as he was driving on Route 4. Horan's testimony established that at 8:28 p.m. on the night of the shooting, Debord sent Cooper a screenshot image of a GPS map showing that Debord's cell phone was located on Route 4. Horan also testified that the cell phone data he analyzed fell in line with Debord's traveling along Route 4. This evidence suggested that Debord's confession to Salisbury about how he disposed of the shell casings was accurate.

{¶ 54} In addition, the evidence established that there were several nine-millimeter bullets fired at the scene of the shooting, but only one shell casing was recovered there. Because the State presented testimony establishing that nine-millimeter firearms do not have an enclosure for spent shell casings, but instead expel them on the ground, the fact that several bullets were fired and only one shell casing was recovered suggests that Debord did indeed collect the shell casings after the shooting; he just happened to miss the one found underneath Shortt. Accordingly, the weight of the evidence established that Debord tampered with the shell casings and impaired their availability as evidence by collecting them and throwing them away on Route 4. Therefore, we do not find that the jury lost its way or created a manifest miscarriage of justice by finding Debord guilty of the tampering with evidence count that pertained to the shell casings.

{¶ 55} As for the count pertaining to Shortt's vehicle, the evidence established that Debord wiped the windows and door handles of Shortt's vehicle with bleach and detergents, removed parts from the vehicle, and attempted to burn the vehicle's contents. Specifically, the evidence established that Debord attempted to burn the driver's manual, the vehicle's certificate of registration, and Shortt's temporary driver's license, birth

certificate, high school diploma, and insurance identification card. The evidence also established that Debord went to the Clark gas station on February 15, 2022, to purchase gasoline in order to burn the vehicle. Therefore, the weight of the evidence established that Debord tampered with Shortt's vehicle and the property contained therein with the purpose to impair its availability as evidence. Accordingly, we do not find that the jury lost its way or created a manifest miscarriage of justice in finding Debord guilty of the tampering with evidence count that pertained to Shortt's vehicle.

{¶ 56} Lastly, because the evidence established that Debord had a prior conviction for a felony drug offense and possessed a nine-millimeter firearm, his conviction for having weapons while under disability also was not against the manifest weight of the evidence. Because Debord's convictions for aggravated murder, aggravated robbery, aggravated burglary, grand theft of a motor vehicle, tampering with evidence, having weapons while under disability, and the associated firearm specifications were not against the manifest weight of the evidence, his fifth assignment of error is overruled.

## First Assignment of Error

{¶ 57} Under his first assignment of error, Debord challenges two evidentiary rulings made by the trial court during his jury trial. Debord first claims that the trial court erred by allowing the State to impeach its own witness, i.e., John Wilson, using a prior inconsistent statement made by Wilson during his video-recorded police interview. Debord also claims that the trial court erred by allowing certain photographs of the deceased victim to be admitted into evidence.

*Standard of Review*

{¶ 58} Generally speaking, "[w]e review a trial court's evidentiary rulings for an abuse of discretion, provided an objection is made at trial." (Citation omitted.) *State v. Beasley*, 2d Dist. Montgomery No. 28016, 2019-Ohio-1901, ¶ 28; *State v. Wright*, 2d Dist. Miami No. 2021-CA-17, 2022-Ohio-1786, ¶ 98. Under an abuse-of-discretion standard of review, we are required to determine "whether the trial court acted unreasonably, arbitrarily, or unconscionably in deciding the evidentiary issues[.]" (Citation omitted.) *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43. "We will not disturb a trial court's evidentiary rulings unless we find 'an abuse of discretion that has created material prejudice.' " *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 53, quoting *Noling* at ¶ 43.

{¶ 59} "[W]hen an appellant alleges a trial court's evidentiary ruling was based on a misconstruction of the law or an erroneous standard, the appellate court must review the trial court's evidentiary ruling using a de novo standard of review." (Emphasis deleted.) *Village of New Holland v. Murphy*, 4th Dist. Pickaway No. 18CA6, 2019-Ohio-2423, ¶ 9, citing *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 16 ("[d]e novo review is appropriate 'where a trial court's order is based on an erroneous standard or a misconstruction of the law' "), quoting *Castlebrook, Ltd. v. Dayton Properties Ltd. Partnership*, 78 Ohio App.3d 340, 346, 604 N.E.2d 808 (2d Dist.1992). *Accord In re Disinterment of Glass*, 2d Dist. Montgomery No. 29160 and 29161, 2022-Ohio-28, ¶ 18.

"De novo review requires an 'independent review of the trial court's decision without any deference to the trial court's determination.' " *State v. Clay*, 2d Dist. Miami No. 2015-CA-17, 2016-Ohio-424, ¶ 5, quoting *Jackson v. Internatl. Fiber*, 169 Ohio App.3d 395, 2006-Ohio-5799, 863 N.E.2d 189, ¶ 17 (2d Dist.).

*State's Impeachment of John Wilson – Evid.R. 607(A)*

**{¶ 60}** As previously noted, Debord first contends that the trial court erred by allowing the State to impeach its own witness, John Wilson, using a prior inconsistent statement that Wilson made during his video-recorded police interview. "Evid.R. 607(A) authorizes a party to impeach its own witness 'by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage.' " *State v. Mckelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 119, quoting Evid.R. 607(A). "[W]hether the elements of surprise and affirmative damage have been established * * * is entrusted to the broad, sound discretion of the trial court." *State v. Litteral*, 2d Dist. Clark No. 2021-CA-10, 2022-Ohio-1187, ¶ 13, citing *State v. Diehl*, 67 Ohio St.2d 389, 391, 423 N.E.2d 1112 (1981).

**{¶ 61}** A party demonstrates surprise under Evid.R. 607(A) "when a witness's testimony materially differs from a prior statement and counsel had no reason to believe that the witness would testify as he did at trial." *McKelton* at ¶ 120; *State v. Gutierrez*, 2d Dist. Montgomery No. 29306, 2022-Ohio-1692, ¶ 18. "The 'affirmative damage' requirement is satisfied if a 'party's own witness testifies to facts that contradict, deny, or harm that party's trial position.' " *Id.* at ¶ 121, quoting *State v. Blair*, 34 Ohio App.3d 6,

9, 516 N.E.2d 240 (8th Dist.1986); *State v. Dearmond*, 179 Ohio App.3d 63, 2008-Ohio-5519, 900 N.E.2d 692, ¶ 28 (2d Dist.).

**{¶ 62}** " 'Affirmative damage' is not shown where the witness denies knowledge of the facts contained in his prior statement or where he states that he does not remember the facts stated therein." *Dayton v. Combs*, 94 Ohio App.3d 291, 299, 640 N.E.2d 863 (2d Dist.1993); *State v. Risden*, 2d Dist. Montgomery No. 22930, 2010-Ohio-991, ¶ 74; *State v. Johnson*, 2015-Ohio-5491, 55 N.E.3d 648, ¶ 33 (2d Dist.). Therefore, "[t]he fact that a witness does not testify as expected does not, in and of itself, constitute 'affirmative damage' as contemplated by Evid.R. 607." *State v. Williams*, 2016-Ohio-5827, 71 N.E.3d 592, ¶ 30 (1st Dist.).

**{¶ 63}** Although it is well established that we review the application of Evid.R. 607(A) for an abuse of discretion, Debord asserts that we should instead review the issue de novo. Debord is incorrect because the issue of whether surprise and affirmative damage have been established per Evid.R. 607(A) does not involve a misconstruction of the law or the application of an erroneous standard. *See Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, at ¶16-18. A de novo review is also inappropriate in this case because Debord waived all but plain error for appeal by failing to raise an objection to the State's impeachment of Wilson. *See State v. Bahns*, 185 Ohio App.3d 805, 2009-Ohio-5525, 925 N.E.2d 1025, ¶ 25 (2d Dist.) ("[f]ailure to object waives all but plain error"). Therefore, Debord's claim that the trial court erred by allowing the State to impeach Wilson is limited to a plain-error review.

**{¶ 64}** To constitute plain error, the error at issue must be an obvious defect in the

trial proceedings, and the error must have affected substantial rights. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). "An error affecting substantial rights 'must have affected the outcome of the trial.' " *State v. Cenexant*, 2023-Ohio-3388, __ N.E.3d __, ¶ 16 (2d Dist.), quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Therefore, plain error arises only when "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

{¶ 65} In this case, the State called Wilson to testify at trial as part of its case-in-chief. During his direct examination, Wilson testified that on February 14, 2022, the day after Shortt was shot, Debord came to Wilson's house with some marijuana and approximately $1,000 in cash. The State then asked Wilson if Debord had said anything that day about a shooting. Wilson responded: "I don't know * * * it was like eight months ago." Trial Tr. Vol. I, p. 145. The State also asked Wilson if he ever spoke to the police about what Debord had said to him that day, and Wilson responded: "I told the police that I got electrocuted by 7,200 volts and my memory's kind of bad." *Id.*

{¶ 66} After Wilson's response, the State began to ask Wilson if watching the video of his police interview would help refresh his memory as to what he had told the police Debord said to him. The trial court, however, interrupted the State and stated the following:

If you're going to impeach, then I wish you would just impeach. By

that, I mean lay a foundation of who he talked to, when he talked to them.

*If he doesn't remember, that's a basis to impeach.* But I don't know that

I'm going to go with refreshing at this juncture[.]

(Emphasis added.) Trial Tr. Vol. I, p. 145.

{¶ 67} Following the trial court's statement, the State attempted to lay a foundation to impeach Wilson. In doing so, the State asked Wilson if he remembered being interviewed by the police and Wilson responded that he did. Wilson also confirmed that he had watched a portion of the video-recorded interview in the prosecutor's office. Despite this, Wilson testified that he did not remember what the police had asked him during the interview. The State then directly asked Wilson if, during the interview, he remembered telling the police that Debord had told him that he had shot someone. In response, Wilson said: "No." Trial Tr. Vol. I, p. 148. After Wilson's response, the trial court permitted the State to impeach Wilson by playing a portion of his video-recorded police interview that showed Wilson telling the police that Debord had told him he (Debord) had shot someone.

{¶ 68} Upon review, we find that the trial court committed an obvious error when it permitted the State to impeach Wilson in such a manner, because there was no showing of affirmative damage to the State as required by Evid.R. 607(A). Specifically, Wilson did not testify to any facts which contradicted, denied, or harmed the State's position. Wilson merely testified that he did not remember if Debord had told him about a shooting and that he did not remember what he had told the police during his interview. As previously discussed, "[a]ffirmative damage" does not exist when a witness denies

knowledge or fails to remember. *Combs*, 94 Ohio App.3d at 299, 640 N.E.2d 863; *Risden*, 2d Dist. Montgomery No. 22930, 2010-Ohio-991, at ¶ 74. The trial court's comment, "If [Wilson] doesn't remember, that's a basis to impeach," directly contradicts this principle.

{¶ 69} That said, we do not find that the outcome of Debord's trial would have been clearly different absent the trial court's error. The evidence presented at trial overwhelmingly established that Debord shot and killed Shortt. The State presented an additional witness, Salisbury, who testified that Debord had admitted to shooting Shortt, and there was a plethora of other evidence that indicated Debord was the shooter. Therefore, based on the overwhelming evidence of Debord's guilt, Debord cannot establish that the outcome of his trial would have been different had the trial court not permitted the State to impeach Wilson regarding a single statement that Wilson made to the police. Accordingly, the trial court's impeachment error was harmless, meaning that Debord cannot establish plain error warranting a reversal of his conviction.

*Admission of Photographic Evidence – Evid.R. 403(B)*

{¶ 70} Debord next claims that the trial court erred by admitting certain photographs into evidence that depicted Shortt's body at the crime scene. Debord's counsel objected to the admission of the photographs on grounds that several other photographs of Shortt's body had already been shown to the jury during the course of trial.

{¶ 71} Debord initially contends that it is unclear from the record whether his

counsel's objection was made under Evid.R. 403(A) or Evid.R. 403(B). Evid.R. 403(A) governs the mandatory exclusion of relevant evidence and provides that: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(B) governs the discretionary exclusion of relevant evidence and provides that: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."

{¶ 72} After reviewing the record, we find that counsel's objection fell under Evid.R. 403(B), because counsel suggested that the photographs at issue were needlessly cumulative when he stated the following during his objection:

> The State has shown several photos of the deceased. I get the detective took pictures of what's going on, but I do not believe that any more pictures need to be shown to indicate what's happened. * * * Obviously, we know he's deceased. I don't see any further evidentiary value of keep (sic) showing pictures.

Trial Tr. Vol. III, p. 370.

{¶ 73} "Pursuant to Evid.R. 403(B), it is within the sound discretion of the trial court to exclude cumulative evidence only when the probative value of the evidence is substantially outweighed by the danger of a material prejudice to the defendant." *State v. Arrone*, 2d Dist. Greene No. 2005-CA-89, 2006-Ohio-4144, ¶ 152. " ' "Cumulative evidence" ' is additional evidence of the same kind to the same point." *State v. Jali*, 2d

Dist. Montgomery No. 28294, 2020-Ohio-208, ¶ 41, quoting *Kroger v. Ryan*, 83 Ohio St. 299, 94 N.E. 428 (1911), syllabus. "The mere fact that evidence is repetitive will not be considered reversible error unless the defendant was unfairly prejudiced thereby." *State v. Baker*, 2d Dist. Montgomery No. 23933, 2011-Ohio-1820, ¶ 16, quoting *State v. Smith*, 80 Ohio St.3d 89, 108-109, 684 N.E.2d 668 (1997). "The pertinent question is whether the evidence was unfairly prejudicial to the defendant, not whether it was unfavorable to him." *Id.*

{¶ 74} It is well established that an abuse of discretion standard of review applies to an Evid.R. 403(B) determination. *See Calderon v. Sharkey*, 70 Ohio St.2d 218, 222, 436 N.E.2d 1008 (1982); *State v. Shine*, 2018-Ohio-1972, 113 N.E.3d 160, ¶ 60 (8th Dist.); *State v. Rice*, 2d Dist. Montgomery No. 28572, 2020-Ohio-4404, ¶ 33. Nonetheless, Debord asserts that we should review the matter de novo. Debord claims that a de novo review is appropriate because the trial court applied the incorrect standard under Evid.R. 403(B) when it overruled his objection. *See Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, at ¶ 16. Specifically, Debord claims that the trial court incorrectly overruled his objection on grounds that the court did not find "any duplicitousness" in the presentation of the photographs at issue. Because the term "duplicitousness" means deceitful,[2] and because whether the photographs were deceitful has no bearing on a Evid.R. 403(B) determination, Debord claims that the trial court's ruling was based on an erroneous standard, which warrants a de novo review of the

---

[2] "Duplicitous" is defined as: "Given to a tricky doubleness in character, speech, or conduct; esp., deceitful in behaving or speaking differently with different persons in relation to the same matter, with the intent of fooling one or more of them." *Black's Law Dictionary* (11th Ed. 2019).

Evid.R. 403(B) issue.

**{¶ 75}** Based on the context of Debord's objection, we presume that the trial court simply misused the term "duplicitousness," as it sounds similar to "duplicative," a term that makes more sense in the context of the objection. Regardless, even if conducting a de novo review as advocated by Debord, we would not find that the trial court erred by admitting the photographs at issue. Although the photographs at issue were cumulative in that two other photographs showing Shortt's body in the basement, i.e. State's Ex. Nos. 70 and 71, had already been shown to the jury, they were not needlessly cumulative. They were not needlessly cumulative because State's Ex. Nos. 70 and 71 showed Shortt's body at a distance while the photographs to which Debord objected, i.e. State's Ex. Nos. 74, 75, and 76, showed Shortt's body at different angles, which allowed the jurors to see where Shortt's body was in relation to the bullet holes in the wall, the areas where blood pooled from Shortt's body, and where Shortt had aspirated blood. In other words, the photographs at issue had a different evidentiary value from the other photographs that depicted Shortt's body, as the other photographs simply gave a lay of the land. Therefore, we do not find that the probative value of the photographs at issue was substantially outweighed by their cumulative nature.

**{¶ 76}** Furthermore, although the trial court's reasoning for admitting the photographs at issue was technically incorrect, "[a] decision that achieves the right result must be affirmed, even if the wrong reasoning is used to justify the decision, because an error in reasoning is not prejudicial." *John A. Becker Co. v. Jedson Engineering, Inc.,* 2018-Ohio-3924, 121 N.E.3d 788, ¶ 19 (2d Dist.); *State v. Blanton*, 2023-Ohio-89, 206

N.E.3d 14, ¶ 33 (2d Dist.) (" 'If a trial court has stated an erroneous basis for its judgment, an appellate court will affirm the judgment if it is legally correct on other grounds, that is, when it achieves the right result for the wrong reasons.' "), quoting *Newcomb v. Dredge*, 105 Ohio App. 417, 152 N.E.2d 801 (2d Dist.1957). Because we find that it was appropriate and not unfairly prejudicial to admit the photographs at issue, the trial court's decision to that effect must be affirmed despite its faulty reasoning.

{¶ 77} We note that Debord also tangentially challenges the trial court's admission of State's Exhibit No. 79, a diagram of the basement where Shortt was shot, on grounds that it was more prejudicial than probative. Because Debord did not object to the diagram at trial, its admission may only be reviewed for plain error. *See Bahns*, 185 Ohio App.3d 805, 2009-Ohio-5525, 925 N.E.2d 1025, at ¶ 25 ("[f]ailure to object waives all but plain error"). As previously discussed, plain error arises only when "but for the error, the outcome of the trial clearly would have been otherwise." *Long*, 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph two of the syllabus. Upon review, we find no error in admitting the diagram. Even if the trial court had erred in admitting the diagram, given the overwhelming evidence of Debord's guilt, the outcome of his trial would not have been different had the diagram not been admitted. Accordingly, Debord cannot establish plain error.

{¶ 78} Debord's first assignment of error is overruled.

### Second Assignment of Error

{¶ 79} Under his second assignment of error, Debord contends that his trial

counsel provided ineffective assistance by failing to object or properly object to the evidence discussed under his first assignment of error, i.e., the State's impeachment of Wilson, the photographs of Shortt's body at the crime scene, and the basement diagram.

{¶ 80} This court reviews alleged instances of ineffective assistance of trial counsel under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which was adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, in order to prevail on an ineffective assistance claim, a defendant must show that his trial counsel rendered deficient performance and that his counsel's deficient performance prejudiced the defense. *Strickland* at paragraph two of the syllabus; *Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 81} To establish deficient performance, a defendant must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Id.* at 688. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

{¶ 82} To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. " 'A

reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Bradley* at 142, quoting *Strickland* at 694.

{¶ 83} Even if this court were to determine that Debord's trial counsel performed deficiently by failing to object or properly object to the evidence at issue, Debord cannot establish that he was prejudiced by counsel's deficient performance in that regard. Even if counsel had objected/properly objected at trial and even if the evidence at issue had not been admitted at trial, there is not a reasonable probability that the absence of that evidence would have affected the outcome of Debord's trial. As previously discussed, there was an overwhelming amount of evidence establishing that Debord shot Shortt several times with a nine-millimeter firearm, stole items of property from Shortt's residence, including his vehicle, and then tampered with various items of evidence. Accordingly, Debord cannot establish any prejudice resulting from his trial counsel's failure to object to the evidence at issue. Without a showing of prejudice, Debord's ineffective assistance of counsel claim necessarily fails.

{¶ 84} Debord's second assignment of error is overruled.

**Third Assignment of Error**

{¶ 85} Under his third assignment of error, Debord claims that the trial court erred by failing to suppress the statements he made during his interview with Sgt. Wale and Det. Stout. Debord asserts that his statements should have been suppressed because he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights. Debord also contends that his statements should have been suppressed because they were coerced

by the detectives' false promises of leniency.

*Standard of Review*

**{¶ 86}** "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When ruling on a motion to suppress, "the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

**{¶ 87}** In this case, the trial court made no findings of fact when overruling Debord's motion to suppress. "Crim.R. 12(F) mandates that a trial court state its essential findings on the record when factual issues are involved in determining a motion to suppress." *State v. Brown*, 2d Dist. Montgomery No. 24297, 2012-Ohio-195, ¶ 10. However, "[i]n order to invoke this provision, trial counsel must request the trial court to state its essential findings of fact on the record." (Citation omitted.) *Id.* Accord *State v. Allen*, 2d Dist. Montgomery No. 28874, 2021-Ohio-3047, ¶ 26, citing *State v. Adams*, 146 Ohio St.3d 232, 2016-Ohio-3043, 54 N.E.3d 1227, ¶ 16. "[I]f the defendant does not

object to the lack of findings, the error is harmless if the evidence is sufficient to demonstrate the basis for the trial court's decision." *State v. White*, 2d Dist. Montgomery No. 23905, 2011-Ohio-503, ¶ 19, citing *State v. Sanchez*, 2d Dist. Greene No. 1997-CA-32, 1998 WL 199618, *10 (Apr. 24, 1998).

**{¶ 88}** Because Debord did not request findings of fact on his motion to suppress or object to the trial court's failure to state any findings of fact, we shall directly examine the record to determine whether there was sufficient evidence to show that the trial court's decision overruling Debord's motion to suppress was supported by the record and legally justified. *See State v. Jackson*, 1st Dist. Hamilton No. C-190676, 2021-Ohio-517, ¶ 8, citing *State v. Shields*, 1st Dist. Hamilton No. C-100362, 2011-Ohio-1912, ¶ 9.


*Miranda Waiver*

**{¶ 89}** As previously discussed, Debord claims that the statements he made during his interview with Sgt. Wale and Det. Stout should have been suppressed because he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights. We disagree.

**{¶ 90}** "In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court outlined procedural safeguards needed for securing the privilege against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution." *State v. Hudson*, 2d Dist. Montgomery No. 29333, 2022-Ohio-3253, ¶ 30. "*Miranda* requires police to give a suspect certain prescribed warnings before custodial interrogation commences and provides that if the warnings are not given, any statements elicited from the suspect through police interrogation in that circumstance

must be suppressed." *State v. Petitjean*, 140 Ohio App.3d 517, 523, 748 N.E.2d 133 (2d Dist.2000). "Furthermore, if, after *Miranda* warnings are given, the suspect indicates that he or she wishes to remain silent, or if the suspect states that he or she wants an attorney, the interrogation must cease." *Hudson* at ¶ 30, citing *Maryland v. Shatzer*, 559 U.S. 98, 104, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010).

{¶ 91} "[A] suspect may effectively waive the rights conveyed in the *Miranda* warnings only if the waiver is made voluntarily, knowingly and intelligently." *State v. Dailey*, 53 Ohio St.3d 88, 559 N.E.2d 459 (1990), citing *Miranda* at 444 and 475. The United States Supreme Court has indicated that this inquiry has two separate dimensions:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), quoting *Fare v. Michael* C., 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

{¶ 92} When considering the totality of the facts and circumstances, we look at "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the

existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *overruled on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978). *Accord State v. Verdell*, 2d Dist. Montgomery No. 27786, 2018-Ohio-4766, ¶ 32. That said, a "written waiver of rights * * * is strong proof" that the waiver was valid. *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988), citing *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

{¶ 93} In this case, Debord does not dispute the fact that he signed a written waiver of his *Miranda* rights prior to his interview with Sgt. Wale and Det. Stout. Debord, however, claims that the waiver was not knowingly, intelligently, and voluntarily made due to his having been in custody for 23 hours before the two-and-half-hour interview and due to his use of marijuana. In addition, Debord claims that Sgt. Wale provided an incomplete definition of the word "coercion" while they were going over the waiver of rights portion of the pre-interview form, and that his (Debord's) lack of understanding of the word "coercion" prevented him from knowingly and intelligently waiving his *Miranda* rights.

{¶ 94} Upon review, we find that Debord's claim that his being in custody for 23 hours before the interview prevented him from knowingly, intelligently, and voluntarily waiving his *Miranda* rights is belied by the video evidence. The video evidence clearly established that Debord was alert and coherent at all times during the interview and that he understood the rights he was waiving. Although Debord stumbled over the word "coercion" while reading the wavier of rights portion of the pre-interview form and indicated that he did not know what "coercion" meant, Sgt. Wale responded to Debord's

confusion by stating that coercion "means that I'm not taking a phone book and whopping you over the head to get answers out of you."   State's Exhibit No. 1 (47:35-47:45). Following this explanation, Debord exhibited no further confusion.

{¶ 95} In *State v. Finley*, 2d Dist. Clark No. 1996-CA-30, 1998 WL 321017 (June 19, 1998), this court found a similar explanation was sufficient to convey the meaning of coercion.   In *Finley*, the officer said: "Do you know what coercion is? I'm not pulling your hair and twisting your arm to get you to talk, that's what that means basically, okay?"   *Id.* at *7.   We found this explanation "sufficient for the purposes of conveying to Finley the notion that the police did not force her to cooperate."   *Id.* at *10.   We also found that "the fact that the officer did not elaborate concerning all possible forms of coercion * * * [did] not render Finely's signed waiver of her *Miranda* rights involuntary."   *Id.*

{¶ 96} Like *Finley*, we find that Sgt. Wale's explanation sufficiently conveyed the meaning of coercion to Debord, as it suggested the officers were not forcing Debord to answer their questions.   Accordingly, Debord's claim that Sgt. Wale's explanation of coercion prevented him from knowingly, intelligently, and voluntarily waiving his *Miranda* rights lacks merit.

{¶ 97} With regard to Debord's claim that his marijuana use prevented him from knowingly, intelligently, and voluntarily waiving his *Miranda* rights, we note that the video evidence established that Debord told the officers that he was a marijuana user, not that he had recently used marijuana.   Since Debord had been in custody for 23 hours before the interview, he presumably would not have been under the influence of marijuana at the time of the interview.

{¶ 98} Even if Debord had been under the influence of marijuana, "[i]ntoxication will not render a defendant's waiver of his *Miranda* rights invalid unless his ability to reason is sufficiently impaired." *Verdell*, 2d Dist. Montgomery No. 27786, 2018-Ohio-4766, at ¶ 34, citing *State v. Monticue*, 2d Dist. Miami No. 2006-CA-33, 2007-Ohio-4615, ¶ 12 and *State v. Stewart*, 75 Ohio App.3d 141, 147, 598 N.E.2d 1275 (11th Dist.1991) (recognizing that alcohol consumption will not render a defendant's waiver of his *Miranda* rights invalid unless his ability to reason is sufficiently impaired). Here, the video evidence did not indicate that Debord's ability to reason was impaired. Although Debord spoke quickly at times, he was otherwise clear, alert, and coherent during the interview. Accordingly, Debord's claim that his marijuana use prevented him from knowingly, intelligently, and voluntarily waiving his *Miranda* rights lacks merit.

{¶ 99} We further find that the length of Debord's interview did not affect the validity of his *Miranda* waiver. The video evidence established that Debord was in the interview room for 37 minutes before the officers arrived to interview him. Once the officers arrived, the entire interview lasted approximately two and a half hours, which is not unreasonable given the nature of the case that was being investigated. At the beginning of the interview, the officers spoke with Debord for nine minutes before discussing Debord's *Miranda* rights. Sgt. Wale testified, and the video evidence confirmed, that during that initial nine minutes, he and Det. Stout engaged in small talk with Debord. Specifically, Sgt. Wale asked Debord about his probation, his past girlfriends, and some other personal, non-criminal background information that was unrelated to the homicide investigation. Sgt. Wale testified that while doing so, he was assessing whether Debord

was alert and able to understand what was going on during the interview.

{¶ 100} After reviewing the video of Debord's interview with Sgt. Wale and Det. Stout, we find that the officers maintained a conversational, non-threatening tone during their discussion with Debord. The officers also asked Debord if he was comfortable and offered him a beverage. There was no coercion of any kind exerted on Debord to induce him to waive his *Miranda* rights. Nothing in the record indicates that the length of the interview affected the validity of Debord's *Miranda* waiver, as the waiver occurred within nine minutes of the interview and the officers did not engage in any inappropriate conduct during that time or anytime thereafter.

{¶ 101} After reviewing the video evidence and Sgt. Wale's testimony, we find that the totality of the circumstances surrounding Debord's interview revealed that his *Miranda* waiver was a free and deliberate choice made without coercion. The totality of the circumstances also established that Debord understood his *Miranda* rights and that Debord had the requisite capacity to waive them. Accordingly, the trial court properly concluded that Debord knowingly, intelligently, and voluntarily waived his *Miranda* rights.

*Police Coercion*

{¶ 102} Debord next contends that the statements he made during his interview with the officers should have been suppressed because they were coerced by the officers' making false promises of leniency in exchange for Debord's providing them with information about Shortt's murder. Specifically, Debord claims that the officers insinuated that he might be charged with premeditated murder unless he provided

information suggesting that Shortt's murder was unplanned. Debord also claims that the officers insinuated that the prosecutors would be less willing to offer him a plea deal unless he provided the officers with a complete picture of what had occurred on the night of Shortt's murder. As a result, Debord claims that his statements during the interview were rendered involuntary because they were made under the false promise of a more favorable legal outcome.

{¶ 103} Even where a valid *Miranda* waiver exists, as in this case, "* * * a statement may be involuntary and subject to suppression if the statement is the product of actual police coercion." *State v. Gray-Mosher*, 2018-Ohio-1422, 101 N.E.3d 729, ¶ 8 (2d Dist.), citing *State v. Nevarez-Reyes*, 2d Dist. Montgomery No. 27047, 2017-Ohio-2610, ¶ 31-32. "[A] court may find coercion when law-enforcement officers 'persuad[e] or deceiv[e] the accused, with false promises or information, into relinquishing his rights and responding to questions." *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 111, quoting *Edwards*, 49 Ohio St.2d at 39, 358 N.E.2d 1051. *Accord State v. Gitzinger*, 2d Dist. Montgomery No. 27893, 2018-Ohio-4445, ¶ 13. Accordingly, "false promises of leniency and misrepresentations of potential punishments by the police are improper." *State v. Williams*, 2d Dist. Montgomery No. 28648, 2021-Ohio-1340, ¶ 63, citing *State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 18 (2d Dist.).

{¶ 104} In contrast to false promises of leniency, "a mere suggestion that cooperation may result in more lenient treatment is neither misleading nor unduly coercive, as people 'convicted of criminal offenses generally are dealt with more leniently when they have cooperated with the authorities.' " *State v. Stringham*, 2d Dist. Miami

No. 2002-CA-9, 2003-Ohio-1100, ¶ 16, quoting *State v. Farley*, 2d Dist. Miami No. 2002-CA-2, 2002-Ohio-6192, ¶ 44. (Other citation omitted.) "Likewise, an investigator's offer to 'help' if a defendant confesses is not improper." *Id.*, citing *State v. Chase*, 55 Ohio St.2d 237, 247, 378 N.E.2d 1064 (1978). (Other citation omitted.) "In addition, admonitions to tell the truth are considered neither threats nor promises and are permissible." *Id.*, citing *State v. Loza*, 71 Ohio St.3d 61, 67, 641 N.E.2d 1082 (1994). Therefore, "[o]fficers may discuss the advantages of telling the truth, advise suspects that cooperation will be considered, or even suggest that a court may be lenient with a truthful defendant." *Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, at ¶ 111; *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 198.

{¶ 105} In this case, the trial court failed to issue a ruling on the portion of Debord's motion to suppress arguing that his statements were rendered involuntary by false promises of leniency, as the trial court only held that Debord validly waived his *Miranda* rights. Had the trial court's failure to rule on the false promises of leniency aspect of Debord's motion to suppress been brought to the trial court's attention, the trial court could have ruled on that issue. *See State v. Walton*, 5th Dist. Fairfield No. 98 CA 00046, 1999 WL 547580, *3 (June 30, 1999). "Normally, an appellate court need not consider an error that was not called to the attention of the trial court at a time when the error could have been avoided or corrected by the trial court." (Citation omitted.) *State v. Hill*, 92 Ohio St.3d 191, 196, 749 N.E.2d 247 (2001); *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 210, 436 N.E.2d 1001 (1982). However, under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to

the attention of the court."

{¶ 106} In this case, we find no error, plain or otherwise, with regard to the Debord's interview. The video evidence established that, toward the end of Debord's interview, the officers suggested that Debord was not being honest with them and advised him that it would be in his best interest to tell the truth about his involvement in Shortt's death. At no point did the officers indicate that Debord's truthfulness would guarantee him a plea deal or any kind of leniency from the trial court. Rather, the officers indicated that Debord's cooperation and honesty could potentially yield a more beneficial outcome. This did not amount to coercion and did not render Debord's interview statements involuntary. Accordingly, Debord's claim that his statements were coerced by false promises of leniency lacks merit.

{¶ 107} Because Debord knowingly, intelligently, and voluntarily waived his *Miranda* rights and because Debord's interview statements were not coerced by false promises of leniency, the trial court properly overruled his motion to suppress.

{¶ 108} Debord's third assignment of error is overruled.

**Fourth Assignment of Error**

{¶ 109} Under his fourth assignment of error, Debord contends that he was denied his constitutional right to a fair trial based on the cumulative effect of the errors raised under his first and third assignments of error. We disagree.

{¶ 110} Pursuant to the cumulative error doctrine "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even

though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 196-197, 509 N.E.2d 1256 (1987). "[I]n order * * * to consider whether 'cumulative' error is present, we would first have to find that multiple errors were committed in this case." *State v. Madrigal*, 87 Ohio St.3d 378, 398, 721 N.E.2d 52 (2000). " 'We then must find a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors.' " *State v. Mize*, 2022-Ohio-3163, 195 N.E.3d 574, ¶ 76 (2d Dist.), quoting *State v. Durant*, 159 Ohio App.3d 208, 2004-Ohio-6224, 823 N.E.2d 506, ¶ 38 (2d Dist.).

**{¶ 111}** In this case, we found no errors under Debord's third assignment of error, which concerned his motion to suppress. Under Debord's first assignment of error, we found that the trial court committed two harmless errors: (1) permitting the State to impeach its own witness without a showing of affirmative damage as required by 607(A); and (2) using improper reasoning to overrule his Evid.R. 403(B) objection to the admission the photographs of Shortt's body at the crime scene. When considering these two harmless errors together, we do not find that there is a reasonable probability that they affected the outcome of Debord's trial. Although the record establishes that the trial court used improper reasoning to admit the photographs that depicted Shortt's body at the crime scene, we ultimately found that those photographs were not needlessly cumulative and were properly admitted into evidence. And as previously discussed, even if the impeachment and photographic evidence at issue had not been allowed at

trial, there was still a significant amount of evidence that established Debord had shot and killed Shortt, stole Shortt's vehicle and other property, and tampered with evidence. Accordingly, we do not find that the cumulative effect of the trial court's two harmless errors deprived Debord of a fair trial.

{¶ 112} Debord's fourth assignment of error is overruled.

**Sixth Assignment of Error**

{¶ 113} Under his sixth assignment of error, Debord argues that the indefinite sentencing scheme found in the Reagan Tokes Law violated his constitutional right to due process, his right to trial by jury, and the separation-of-powers doctrine. We disagree.

{¶ 114} The Reagan Tokes Law introduced an indefinite-sentencing scheme for first and second-degree felonies committed after March 22, 2019. *See* R.C. 2967.271; *State v. Sinkhorn*, 2d Dist. Clark No. 2019-CA-79, 2020-Ohio-5359, ¶ 27. In *State v. Hacker*, Ohio Slip Opinion No. 2023-Ohio-2535, __ N.E.3d __, the Supreme Court of Ohio recently found the Reagan Tokes Law to be constitutional and held that the law does not violate the separation-of-powers doctrine, the right to a jury trial, or the right to due process. *Id.* at ¶ 25, 28, 29-41. We have consistently reached the same conclusion. *See State v. Leamman*, 2d Dist. Champaign Nos. 2021-CA-30 and 2021-CA-35, 2022-Ohio-2057, ¶ 11 (finding that the Reagan Tokes Law is not violative of due process, trial by jury, or the separation of powers doctrine and citing several Second District cases rejecting constitutional challenges); *State v. Dennison*, 2d Dist. Champaign No. 2021-CA-

42, 2022-Ohio-1961, ¶ 15-22 (finding that the Reagan Tokes Law does not violate a defendant's statutory rights to appeal, right to trial by jury, right to counsel, due process rights, or the separations of powers doctrine).

**{¶ 115}** Based on the foregoing case precedent, and because Debord has not presented any novel issues or any new theory challenging the constitutional validity of the Reagan Tokes Law left unaddressed by the Supreme Court in *Hacker*, his sixth assignment of error is overruled.

## Conclusion

**{¶ 116}** Having overruled all of Debord's assignments of error, his judgment of conviction is hereby affirmed.

. . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.